Roberta J. WARD, Plaintiff-Respondent,

v.

PENN MUTUAL LIFE INSURANCE COMPANY, a corporation, Defendant-Appellant.

No. 8000.

Springfield Court of Appeals.

Missouri.

Dec. 20, 1961.

**414**

Mann, Walter, Powell, Burkart & Weathers, John R. Lewis, Springfield, for defendant-appellant.

Farrington & Curtis, Thomas G. Strong, David G. Holden, Springfield, for plaintiff-respondent.

STONE, Judge.

Shortly after midnight on September 22, 1960, Marvin B. Ward was thrown or caused to fall from the *top* of a 1958 Chevrolet station wagon (on which he had been riding) to the pavement on East Division Street in Springfield, Missouri, and sustained injuries of which he died the same day. At the time of Ward's death, two policies issued by defendant on his life were in full force and effect; and, in due course, defendant paid the basic insurance benefits provided by those policies. In this action, Roberta J. Ward, the widow and named beneficiary in the policies, sued for double indemnity benefits payable in the event of death resulting directly and independently of all other causes from bodily injury effected solely "by external, violent and accidental means"; and, upon trial, plaintiff beneficiary had a verdict on Count I for $5,146.67 and on Count II for $2,573.34. On this appeal, defendant's primary contention is

that its motion for directed verdict at the close of all the evidence should have been sustained because the evidence showed, as a matter of law, that Ward's death did not result from "accidental means." As spelled out in its verdict-directing instruction, defendant's theory has been (and still is) that Ward's death was a direct and proximate result of "his voluntary and wanton exposure to unnecessary and known danger because of his having voluntarily and knowingly assumed a position of lying prone, with legs and arms outstretched, on the top of an automobile driven by Harry Lee Murrell * * and thereafter insisting that said automobile be driven while he remained in that position," by reason of which "his death was neither unusual nor unexpected, and was the natural and probable consequence of said voluntary acts."

At the close of their workday about 4:45 P.M. on September 21, 1960, Ward (then thirty years of age) and Murrell (about thirty-three years of age), both of whom were employed in "line work" for Southwestern Bell Telephone Company, met at the Twilight Inn. Within a few minutes, they were joined by LeRoy Arthur Patterson (about forty-five years of age), a teletype repairman for Southwestern Bell. During the ensuing period of some four and three-quarters hours, this thirsty triumvirate diligently devoted themselves to the divertisements of "drinking beer and talking," with each participant downing some nine or ten bottle-sized steins of 5% beer. About 9:30 P.M. they decided upon a change of surroundings; and, with Murrell at the wheel of his station wagon and both Ward and Patterson then riding *inside* that vehicle, the trio repaired to the Blue Ribbon Bar at the southwest corner of Commercial and Jefferson, where each had two "bowls" (somewhat larger than steins) of 5% beer and then ordered a fried chicken supper. About 11:30 P.M. (as Murrell remembered it) or midnight (as Patterson thought), they left the Blue Ribbon and went to the sta-

tion wagon on the parking lot behind (or south of) the bar, intending to return to the parking lot at the Twilight Inn where Ward and Patterson had left their automobiles. Murrell again got into the driver's seat of his station wagon and Patterson prepared to enter through the right front door. But Ward stepped on the rear bumper, climbed on top of the station wagon, and assumed a "face-down," flat, "sort of spread-eagled position" with his head near the front of the vehicle and his arms outstretched to grasp the tops of the front doors. With Ward, in his exuberance, "cutting up in general" and pounding on top of the station wagon, Patterson told the ebullient topsider to get down and, when the latter did not comply, Patterson braced himself against the side of the station wagon, grabbed Ward's right wrist, and "tried to pull him off the car * * * two or three times." But, with Patterson pulling as hard as he could, he "was unable to budge (Ward) at all." Ward jerked his right arm loose, grinned at Patterson, and told him "this is the only way I am going to ride."

Thus failing to dislodge Ward from his position atop the station wagon, Patterson got into the front seat and Murrell, after backing out of the parking lot, started west down the east-and-west alley behind the Blue Ribbon. Before reaching Robberson, the next north-and-south street, Murrell made an apparently unscheduled stop behind Floyd's Bar, entered the rear door of that tavern, and remained inside about five minutes— "I (Murrell) don't recall of having a beer; I think I just more or less passed the time of day for a little while." Returning to his station wagon, Murrell found Patterson "nodding" in the front seat and Ward, still in the same position, "sort of pounding on top of the car in a rhythm." This bizarre behavior had awakened witness Farmer, then asleep on the second-floor porch of an adjacent rooming house; and, with the scene illuminated by a light at the rear of Floyd's Bar, Farmer plainly saw Ward,.

"a big husky boy," with both arms outstretched "holding onto something" as Murrell "drove off just normally"—"just like you or I would." A few minutes later and about eleven blocks distant, Ward's unconscious body was found by witness Bunch, a taxi driver, on East Division Street some twenty to thirty yards east of the intersection of Division and North Sherman Avenue. His head was some three to four feet south of the white center line on Division with the body angling in a southwesterly direction. There was "blood all over his face, his mouth, his ears and his eyes."

On direct examination, Murrell (a defendant's witness) testified that, after he left Floyd's Bar, he drove west down the alley to Robberson (the next north-and-south street), made a left-hand turn and proceeded south on Robberson to Division (a distance of about three blocks), and there made another left-hand turn and proceeded east on Division to the point of tragedy. On cross-examination, he conceded that he could not remember what route he had followed after leaving Floyd's Bar. However, he said that he had been traveling *east* on Division when, at a point about one hundred fifty yards east of the intersection of Division and Sherman, a then unidentified woman in an automobile had stopped him and had called his attention to the fact that "they had found someone in the street." After then discovering that Ward was not on top of the station wagon, "I (Murrell) walked back to where this fellow was laying in the street, Mr. Ward, and when I got there I saw him; there was already a car, or something, some sort of vehicle stopped there in front of him; and I started to pick him up, I heard somebody say, 'Don't touch that man, don't pick him up,'" so "I turned around and went up to my car" and drove away. He did not remember whether he had backed before driving away to the east, and he had no recollection whether he had circled around and returned to the scene.

Patterson (likewise a defendant's witness), drowsy and dozing after he got into the station wagon behind the Blue Ribbon Bar, had only "a vague memory" of the stop behind Floyd's Bar and no recollection of what had occurred thereafter until he "heard a horn honking * * * and a lady's voice saying 'there is a man laying in the street back there.'" Opening his eyes, Patterson found that the station wagon had stopped, headed *east* on Division, about one-half block east of the intersection of Division and Sherman. Patterson's trial version was that Murrell thereafter *backed* his station wagon on the north side of Division and the then unidentified lady also backed her automobile toward the prostrate figure on the pavement; that Patterson did not get out of the station wagon and did not recognize the man in the street; that Murrell did alight, went over to the body, came back to the station wagon, "drove off a short ways, * backed up once more, and then drove off again east" on Division Street; and, that Murrell thereafter circled to the right around several blocks and came back to the intersection of East Division and North Clay (one short block west of the intersection of Division and Sherman), from which point it was observed that Ward was being loaded into an ambulance.

Murrell then proceeded to the Twilight Inn, where Patterson got into his parked automobile, and both drove directly to their respective homes. In their first statements to investigating police officers, Murrell and Patterson said that they had separated from Ward when they left the Blue Ribbon—"that he (Ward) went one direction and we went the other." According to Murrell and Patterson, they subsequently gave other statements to the officers which were substantially the same as their testimony upon trial. Both refused to testify at the inquest into Ward's death, Murrell because "I felt I was still under shock" and Patterson "on advice of counsel."

In rebuttal, plaintiff called Lavonna Rotzinger who, east-bound on Division on

her way to work at the Lily-Tulip plant shortly after midnight, slowed down when she saw a man lying in the street just east of the intersection of Division and Sherman but, being alone, was afraid to stop immediately. However, as she reached the top of the grade east of this intersection, the headlights of her automobile shone on a two-tone station wagon (the Murrell vehicle) which was standing unlighted, just north of Division but headed back to the south, in the first intersecting north-and-south alley or street east of the prostrate body. When the headlights of the Rotzinger automobile struck the unlighted station wagon, the driver of that vehicle (Murrell) immediately turned on his headlights and made *a right turn to the west* onto Division. As the *west-bound* station wagon and the east-bound Rotzinger automobile came side by side, both vehicles halted and witness Rotzinger told the two men in the station wagon "that there was a man laying in the street back there" but that she had not stopped because she was alone. Although neither of the two men in the station wagon spoke, the driver (Murrell) *started forward to the west* so witness Rotzinger backed her automobile to the west beside the station wagon. When the vehicles stopped near the body, both drivers alighted and walked to Ward.

North Clay Avenue is the first north-and-south street west of North Sherman Avenue, so a vehicle east-bound on Division Street (along the route which Murrell said, on direct examination, he had taken) would have passed through the intersection of East Division and North Clay only a short block before reaching the intersection of East Division and North Sherman. There is "a bad dip" in Division Street at the intersection of Division and Clay; and, as witness Bunch observed without objection, "you have to hit it kind of slow, or your head will hit the top of the car if you are not careful." After passing this bad dip at Division and Clay, an east-bound vehicle on Division would have traveled down "a

pretty good little grade" in the short block to the intersection of Division and Sherman, would have passed through a "level dip" at the latter intersection, and then would have started upgrade.

The record includes considerable evidence bearing upon the extent of the reasonably foreseeable danger to Ward in his riding upon the top of Murrell's station wagon. Ward, then thirty years of age, was about *six feet one inch in height*, weighed an estimated one hundred seventy-five to one hundred ninety pounds, and wore a 34-inch sleeve. The undisputed evidence convincingly established that he was an athletic, muscular, strong individual. Murrell said that Ward was "as strong as a bull," that he was "as strong as any man down there" (referring to Southwestern Bell where both Murrell and Ward were employed), that "he was a man that you couldn't wear out," that in his work he could climb telephone poles with gaffs on his legs "like a cat," and that, while working on poles, Ward pulled up heavy materials "that would weigh * * as high as a hundred pounds or more." Patterson referred to Ward as "a very, I would say, exceedingly strong individual." During the Summer of 1960 when Ward was building a cabin, he and Murrell shoveled and moved by wheelbarrow three truck loads of gravel one morning and then poured the cabin floor that same afternoon. It was shown also that Ward was an archer who used a 58-pound bow (i. e., a bow requiring fifty-eight pounds of pressure "to cock it in an aiming position"), and that as a bow-and-arrow hunter he had held his bow in a cocked position "for a period of time" and had killed two deer. For some time (although, of course, not on the date of this tragedy), Ward had worked both for Southwestern Bell and for a cab company. During that period of dual employment, Ward had worked five days each week for Southwestern Bell from 8:00 A.M. to 4:30 P.M. with one-half hour for lunch, and seven days each week for the cab company from 5:30 P.M. to 2:00 or 3:00 A.M.

Returning to the night of this tragedy, we note that there was testimony by Murrell that he was "perfectly able to drive" when he and his companions left the Blue Ribbon and that all of them "were perfectly able to walk and control (themselves) physically," and by Patterson that none of the three then "showed any influence of liquor." Witness Rotzinger, who had stood "right beside" Murrell near Ward's body, said that "he acted all right to me," that his "manner of walking" did not indicate that he had been drinking, and that there was no odor of alcohol about him. Plaintiff testified that, in a telephone conversation with her husband (Ward) about 11:00 P.M. on September 21, there was no indication "that he was in any degree under the influence of alcohol." And, in a colloquy near the close of the trial, defendant's counsel stated that he could not argue that Ward was intoxicated, for "there is no evidence of it."

As witness Farmer from his second-story vantage point watched Murrell drive from the rear of Floyd's Bar, Ward did not roll or bounce around on top of the station wagon but remained stationary with outstretched arms "holding onto something." Officer Shaffer of the Springfield Police Department (called as a defendant's witness), an identification technician with thirty years' experience, made a minute examination of the top of Murrell's station wagon on the day following Ward's death. That examination disclosed (1) "an oily spot" about five inches in circumference, some two feet from the front and about equidistant from the sides of the top, which Shaffer believed to have been made by Ward's forehead (there is, so Shaffer said, more oil in skin on the forehead than on other areas of the face), (2) two small brass-colored marks about one and one-quarter inches in length, some three feet behind the oily spot, which were of the same color and appearance as the brass buckle on Ward's belt and, in Shaffer's opinion, had been made by that buckle, (3) two crescent-shaped black marks about one and

three-quarters inches in length, some three feet behind the brass-colored belt buckle marks, which Shaffer believed to have been made by the edges of the heavy black rubber or composition soles of Ward's shoes (white oxidized paint corresponding to that on top of the station wagon was found on the edges of Ward's shoe soles), (4) Ward's palm print about eight inches to the left of the oily spot (i. e., toward the driver's door), which could have been made as he lowered his weight onto the top, and (5) one whole fingerprint (identified as Ward's print) and many smudged prints above the top of the front door on each side, which, in Shaffer's opinion, had been made as Ward held to the top of the doors while riding. From his examination of the oily spot, the two small brass-colored belt buckle marks, and the two crescent-shaped black shoe sole marks, Shaffer said that "there was no indication that the man had moved at any time." ·

In rebuttal, plaintiff produced one Royal Thomson, a dock foreman for Campbell "66" Express, who was six feet one inch in height, weighed about one hundred seventy-five pounds, and had a sleeve length of thirty-three inches. Over defendant's objections, Thomson was permitted to testify that, on the Saturday morning prior to the trial, he had ridden in a face-down, spread-eagled position on top of a 1958 Chevrolet station wagon for a distance of about one mile over a semi-blacktop road east of Springfield "considerably rougher" than the surface of East Division Street, as the station wagon was driven up and down hills at a speed of about forty-five miles per hour and around two "country square corners" or "right-hand turns" at thirty miles per hour. Thomson said that, in the course of this ride, he had experienced very little wind resistance, "there was no movement whatsoever" of his body, and no part thereof bounced away from the top of the station wagon. The top "gave" under his weight and formed "more or less a cradle" —"you are bedded down more or less into the top." This ride, at speeds higher than the speed limit on Division Street, was not

attempted on Division because, as Thomson put it, "we were afraid the law might interfere." Prior to the ride on top of the 1958 Chevrolet station wagon, Thomson had ridden a few times on top of other automobiles. Over objection, the plaintiff widow testified that she had seen Ward ride, without incident, on top of a moving vehicle on Glenstone Avenue in Springfield.

Ward not only was a fellow-employee of Murrell but also was a hunting companion and, as Murrell expressed it, "a very good friend." Without objection, Murrell said that Ward had ridden with him on other occasions, trusted his (Murrell's) driving, and had no reason whatever to think that Murrell would do anything to endanger Ward. In driving from the Blue Ribbon Bar to the Twilight Inn, Murrell could have followed any one of several different routes, and there was no evidence that Ward knew, when he climbed on the station wagon, which of those routes Murrell intended to take.

■ Instant plaintiff was content, in her case in chief, to establish the violent death of her husband, the insured. This made a prima facie case of death by accidental means so that defendant's motion for a directed verdict at the close of plaintiff's case properly was overruled. Sellars v. John Hancock Mut. Life Ins. Co., Mo.App., 149 S.W.2d 404, 405(1); McKeon v. National Casualty Co., 216 Mo.App. 507, 518, 270 S.W. 707, 710(2); Meadows v. Pacific Mut. Life Ins. Co. of Cal., 129 Mo. 76, 92, 31 S.W. 578, 583. On this appeal, the substance and import of plaintiff's initial contention is that, since defendant's evidence was oral' (not documented) and was not admitted by plaintiff to be true, defendant thereafter could not have been entitled to a directed verdict at the close of all the

evidence, because in any event the jury, would have had the right to disbelieve evidence of that character in its entirety. Language to that effect (upon which plaintiff relies) may be found in Smith v. Metropolitan Life Ins. Co., Mo.App., 107 S.W.2d 808, 811(6, 7), but numerous authorities leave no room for doubt but that plaintiff's contention may not be accepted in this category of cases. See particularly Berne v. Prudential Ins. Co. of America, 235 Mo. App. 178, 129 S.W.2d 92.

■ The presumption of death by accidental means, raised by plaintiff's showing of insured's violent death and utilized to make a prima facie case, was *not evidence* of the fact presumed but was only a *rebuttable legal presumption* which had the *procedural* effect of shifting to defendant the *burden of going forward with the evidence.*[1] That insured's death had resulted from accidental means was an essential element of plaintiff's cause of action, as to which the *burden of proof* rested upon and abided with plaintiff throughout the case [Gennari v. Prudential Ins. Co. of America, Mo., 335 S.W.2d 55, 60(1); Boring v. Kansas City Life Ins. Co., Mo., 274 S.W.2d 233, 239(9); Griffith v. Continental Casualty Co., 299 Mo. 426, 444, 253 S.W. 1043, 1048 (8, 9)], and defendant's contention (i. e., that insured's death was a direct and proximate result of voluntary and wanton exposure to unnecessary and known danger, so that his death was neither unusual nor unexpected but was the natural and probable consequence of such voluntary act) simply disputed and disavowed that essential element of plaintiff's cause of action (i. e., that insured's death had resulted from accidental means) and did not constitute an affirmative defense. Gennari v. Prudential Ins. Co. of America, supra, 335 S.W.2d loc.

1. O'Brien v. Equitable Life Assur. Soc. of U. S., 8 Cir., 212 F.2d 383, 386-387, certiorari denied 348 U.S. 835, 75 S.Ct. 57, 99 L.Ed. 658; Griffith v. Continental Casualty Co., 299 Mo. 426, 444-445, 253 S.W. 1043, 1048(10); Sellars v. John Hancock Mut. Life Ins. Co., Mo.App., 149 S.W.2d 404, 405-406(2); Ray v. Mutual Life Ins. Co. of N. Y., Mo.App., 218 S.W.2d 986, 990(3). See also Toole v. Bechtel Corp., Mo., 291 S.W.2d 874, 880 (5-7).

cit. 60–61.[2]  If defendant had adduced positive, clear and certain evidence, in no material respect self-impeaching, which plainly revealed the circumstances under which insured had been injured, convincingly showed that such injury was not by accidental means, and fairly afforded no reasonable basis for a contrary conclusion, numerous reported cases in this jurisdiction[3] demonstrate that a verdict for defendant properly might have been directed even though its evidence was altogether oral, unless plaintiff thereafter had produced in rebuttal substantial evidence bringing the case within the policy coverage.  However, with neither Murrell nor Patterson professing to have any reliable recollection or definite knowledge as to the time when Ward was thrown from the top of the moving station wagon or as to the speed at which or the manner in which that vehicle was being driven immediately prior thereto, we have no direct evidence concerning the tragic occurrence itself [contrast Landau v. Pacific Mut. Life Ins. Co., 305 Mo. 542, 267 S.W. 370; State ex rel. Bowdon v. Allen, 337 Mo. 260, 85 S.W.2d 63]; and, with both Murrell and Patterson cast in the ugly, unhonorable and unenviable role of self-confessed liars to the investigating officers, and with their trial versions of the factual circumstances effectively impeached in material particulars, certainly their testimony fell far short of being clear, certain, convincing and compelling.  Winter v. Metropolitan Life Ins. Co., Mo.App., 129 S.W.2d 99; Russell v. Metropolitan Life Ins. Co., Mo.App., 149 S.W.2d 432.

We recognize the general principle (emphasized by defendant) that, even though an injury may be unexpected, unforeseen and unusual, it does not occur by accidental means if the means causing the injury has been employed by insured voluntarily in the usual and expected way.  Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 660, 267 S.W. 907, 921, 39 A.L.R. 56.  But, for intelligent application of the principle, it is necessary to bear in mind that "means," as used in policy provisions such as those under consideration, is equivalent to "cause,"[4] and it is equally essential to understand that, "(s)ince the question of whether accidental means have been employed in a given instance is one which involves the intention or voluntary conduct of the insured, the matter becomes the more

**2.**  Contrast Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 369, 1 S.W.2d 99, 101(1, 2), 57 A.L.R. 615 (erroneously regarded as controlling in Smith v. Metropolitan Life Ins. Co., Mo.App., 107 S.W. 2d 808, 810–811), in which insurer's defense upon a policy provision excepting liability for injury received in "any vehicle or mechanical device for aerial navigation" was an *affirmative defense,* as to which insurer had the burden of proof. "It is * * * the general rule *in such circumstances* that the plaintiff's case cannot be taken from the jury, for he has the right to have the jury pass on the credibility of the defendant's witnesses and the weight of their testimony, though uncontroverted," unless "the proof is documentary, or the defendant relies on the plaintiff's own evidential showing (or evidence which the plaintiff admits to be true), and the reasonable inferences therefrom all point one way." (Emphasis ours.)  *In this connection, see* also Hughes v. Aetna Ins. Co., Mo., 261 S.W.2d 942, 951–952.

**3.**  Ieppert v. John Hancock Mut. Life Ins. Co., Mo.App., 347 S.W.2d 436, 444(1); Perringer v. Metropolitan Life Ins. Co., 241 Mo.App. 521, 244 S.W.2d 607; Ray v. Mutual Life Ins. Co. of N. Y., supra; Sellars v. John Hancock Mut. Life Ins. Co., supra; Berne v. Prudential Ins. Co. of America, 235 Mo.App. 178, 129 S.W. 2d 92.  See also State ex rel. Bowdon v. Allen, 337 Mo. 260, 85 S.W.2d 63, and Hendrix v. Metropolitan Life Ins. Co., Mo., 250 S.W.2d 518, 520–521(2, 3).

**4.**  Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 660, 267 S.W. 907, 921, 39 A.L.R. 56; Callahan v. Connecticut General Life Ins. Co., 357 Mo. 187, 193, 207 S.W.2d 279, 282–283; Camp v. John Hancock Mut. Life Ins. Co., Mo.App., 165 S.W.2d 277, 280, certiorari denied Mo.Sup. (No. 38393); Pope v. Business Men's Assur. Co. of America, 235 Mo.App. 263, 274, 131 S.W.2d 887, 892(3); 45 C.J.S. Insurance § 754, loc. cit. 784.

complicated when some human agency other than the act of the insured himself has entered into the doing of the things which produced the ultimate result." Camp v. John Hancock Mut. Life Ins. Co., Mo.App., 165 S.W.2d 277, 281, certiorari denied Mo.Sup. (No. 38393). In this connection, see also Callahan v. Connecticut General Life Ins. Co., 357 Mo. 187, 195, 207 S.W.2d 279, 284.

In the case at bar, Ward voluntarily and intentionally assumed a spread-eagled position on top of Murrell's station wagon while it was parked behind the Blue Ribbon Bar. But, obviously that action would not, *in and of itself,* have endangered Ward's life, even as the insured's conduct under review in the Callahan case, supra, in "just sitting in the car under the temperature and conditions prevailing" would not have endangered his life. [357 Mo. loc. cit. 196, 207 S.W.2d loc. cit. 285] Ward's position on top of the station wagon subsequently resulted in his death only by reason of movement of that vehicle and thus by reason of Murrell's conduct, for which we think (and there is no suggestion to the contrary) that Ward was not legally chargeable, even as it was said in the Callahan case, supra, that the insured was not legally chargeable with the extraneous force (namely, the weather) which resulted in his death. [357 Mo. loc. cit. 195, 207 S.W.2d

loc. cit. 284] Particularly in situations of this character where "some human agency other than the act of the insured himself has entered into the doing of the things which produced the ultimate result" [Camp v. John Hancock Mut. Life Ins. Co., supra, 165 S.W.2d loc. cit. 281], the reported cases in this[5] and other[6] jurisdictions (many of which are cited in instant defendant's brief) alike attest the overriding importance of the question as to whether the insured reasonably should have anticipated and foreseen injury as a natural and probable consequence of his voluntary action. So, in ruling instant defendant's earnest contention that it was entitled to a directed verdict, the determinative question becomes whether we may say, *as a matter of law,* that, when Ward assumed a spread-eagled position on top of the station wagon, he reasonably should have anticipated and foreseen, as a natural and probable consequence of his action, that in Murrell's driving of the station wagon to the Twilight Inn he (Ward) would be dislodged from his position and thereby might sustain injury or death.

In resolving this question and determining the submissibility of the case, we have, as is our duty, viewed the evidence in the light most favorable to plaintiff [Edwards v. Business Men's Assur. Co., 350 Mo. 666, 678, 168 S.W.2d 82, 88] and ac-

---

5. Sellars v. John Hancock Mut. Life Ins. Co., supra, 149 S.W.2d loc. cit. 409; Russell v. Metropolitan Life Ins. Co., Mo. App., 149 S.W.2d 432, 436(6); Podesta v. Metropolitan Life Ins. Co., Mo.App., 150 S.W.2d 596, 598(4), certiorari denied Mo.Sup. (No. 37749); Camp v. John Hancock Mut. Life Ins. Co., supra, 165 S.W.2d loc. cit. 281–283, certiorari denied Mo.Sup. (No. 38393); Moore v. Metropolitan Life Ins. Co., Mo.App., 237 S.W.2d 210, 212; Perringer v. Metropolitan Life Ins. Co., supra, 241 Mo.App. loc. cit. 537–538, 244 S.W.2d loc. cit. 617(7, 8). See also Lovelace v. Travelers' Protective Ass'n., 126 Mo. 104, 114, 28 S.W. 877, 879, 30 L.R.A. 209.

6. Mutual Life Ins. Co. of New York v. Distretti, 159 Tenn. 138, 17 S.W.2d 11,

12(3); Winton v. Metropolitan Life Ins. Co., 174 Tenn. 252, 124 S.W.2d 712, 713 (3); Baker v. National Life & Acc. Ins. Co., 201 Tenn. 247, 298 S.W.2d 715; Magnoli v. John Hancock Mut. Life Ins. Co., 192 Misc. 344, 78 N.Y.S.2d 130, 134 (11); Kalahan v. Prudential Ins. Co. of America, 194 Misc. 87, 84 N.Y.S.2d 433, 436; Riggins v. Equitable Life Assur. Soc., 64 Ga.App. 834, 14 S.E.2d 182, 183–184(2); Carolina Life Ins. Co. v. Young, 99 Ga.App. 848, 110 S.E.2d 67, 71. See also Kinavey v. Prudential Ins. Co. of America, 149 Pa.Super. 568, 27 A.2d 286, 288; McGuire v. Metropolitan Life Ins. Co., 164 Tenn. 32, 46 S.W.2d 53, 54; Smith v. Aetna Life Ins. Co., 115 Iowa 217, 88 N.W. 368, 370, 56 L.R.A. 271; 29A Am.Jur., § 1176, loc. cit. 322.

corded to her the benefit of all inferences fairly deducible from the evidence [Landau v. Pacific Mut. Life Ins. Co., supra, 305 Mo. loc. cit. 557, 267 S.W. loc. cit. 374(3)], remaining mindful that, in this general category of actions as in others, a submissible case may be made on circumstantial evidence [e. g., Edwards v. Business Men's Assur. Co., supra, 350 Mo. loc. cit. 678–680, 168 S.W.2d loc. cit. 88–90; Gilpin v. Aetna Life Ins. Co., 234 Mo.App. 566, 132 S.W.2d 686] and that a case should not be withdrawn from the jury unless the facts and inferences fairly deducible therefrom, when considered most favorably to plaintiff, leave no room for different conclusions by reasonable men in the honest exercise of an impartial judgment. Winter v. Metropolitan Life Ins. Co., supra, 129 S.W.2d loc. cit. 103(2–5); Antweiler v. Prudential Ins. Co. of America, Mo.App., 290 S.W.2d 652, 653 (2). That our perspective might not become distorted, we also have borne in mind that, with no policy exception or exclusion relieving defendant of liability in any such event or for any such reason, submissibility of plaintiff's case would not be precluded simply by a showing that the insured (Ward) was under the influence of an alcoholic beverage, or was careless and negligent, or voluntarily exposed himself to known danger.[7]

No case has been cited or found in which an insured has fallen or been thrown from the top of a moving motor vehicle, but our research has disclosed three cases in which benefits have been sought for the death of an insured riding on top of a moving train. In one of those cases [Cox v. Mutual Life Ins. Co. of Baltimore, Mo.App., 109 S.W.2d 694], a policy provision specifically excluded liability for death "from violation of law by the insured"; and, it appearing that insured was killed (when struck by an

overhead beam) while stealing a ride on top of a passenger train in violation of an applicable Illinois statute and that such violation of law materially increased insured's risk of accidental death, the court understandably directed a judgment for defendant. That holding is not relevant or persuasive here. In each of the other two cases [Continental Casualty Co. v. Whitmore, 79 Ind.App. 157, 137 N.E. 575; Pacific Mut. Life Ins. Co. v. Adams, 27 Okl. 496, 112 P. 1026], it was held that plaintiff-beneficiary had made a submissible case notwithstanding the important fact that the policy coverage was more limited and restricted than in the case at bar, in that there was a specific exclusion of liability for "voluntary exposure to unnecessary danger" in the Continental Casualty case and for "unnecessary exposure to danger or perilous venture" in the Pacific Mutual case. Particularly interesting and pertinent is the reasoning in the Continental Casualty case [137 N.E. loc. cit. 577], where the insured was lying on his stomach on top of a freight train when there was a separation in the train caused by a broken arch bar on one of the cars: "We would not be warranted in holding the act in question to be a 'voluntary exposure to unnecessary danger,' as a matter of law, if different men, equally intelligent and unbiased, might fairly differ in their opinions in that regard, after considering all the attending facts and circumstances shown by the evidence, such as the age and experience of the decedent, the character of the roadbed, tracks, and train, the manner in which the train was operated, the means which might be used to prevent being thrown therefrom, the use which the decedent made of such means, the cause of the accident, whether it was usual and therefore should have been anticipated, or otherwise, the knowledge possess-

---

7. Callahan v. Connecticut General Life Ins. Co., supra, 357 Mo. loc. cit. 196, 207 S.W.2d loc. cit. 285; Union Central Life Ins. Co. v. Cofer, 103 Ga.App. 355, 119 S.E.2d 281, 285(2, 4); United States Mut. Acc. Ass'n. v. Hubbell, 56 Ohio St. 516, 47 N.E. 544, 546, 40 L.R.A. 453; Kinavey v. Prudential Ins. Co. of America, supra, 27 A.2d loc. cit. 288(6); 45 C.J.S. Insurance §§ 774, 775, and 785, pp. 805, 808 and 824, resp.; 29A Am. Jur., Insurance, § 1174, p. 320.

ed by the decedent of the general danger in so riding, and of the particular danger which caused his injuries."

In this case, we are concerned primarily with the related conduct of Ward, an exceptionally strong and virile man in the physical prime of life, and of Murrell, Ward's fellow-workman, hunting companion, drinking comrade, and close friend. From the evidence adduced, we believe that the triers of the facts reasonably could have inferred and found that, when Ward assumed a spread-eagled position on top of Murrell's station wagon, he (Ward) was in a position which enabled him to grasp and hold firmly to the top of the front doors—the same position in which he previously had ridden safely on top of other moving motor vehicles; that, on this occasion, Ward did grasp and hold firmly to the top of the front doors and did ride safely, without material movement or substantial change of his position, to a point near the location where his body was found; that Ward had no reason to doubt Murrell's ability to drive on this occasion or to foresee that Murrell might not proceed with appropriate regard for the safety of his topside passenger; and, that Ward was thrown or caused to fall from his position by reason of some unusual force generated by and resulting from Murrell's handling and driving of the station wagon, which said force was extraneous and external to Ward and unexpected and unforeseen by him. Consult Guaranty Trust Co. v. Continental Life Ins. Co., 159 Wash. 683, 294 P. 585, 587.

Without moralizing upon Ward's participation in a protracted beer-drinking bout, that phase of the case may be dismissed with the sage comment of our Supreme Court, en banc (buttressed by that court's citation of Proverbs 23:29–32, and our addition of Proverbs 20:1, from the inspired writing of the world's wisest man), that: "Peradventure drinking makes some men surly, ugly, unaccommodating, and obstinate; some mellow, merry and yielding; some vivacious and witty; some stupid and sodden; and, since the days of Noah to this very day, all men the worse off in the long run." Donaldson v. Donaldson, 249 Mo. 228, 238, 155 S.W. 791, 794. And, without philosophizing concerning Ward's conduct after leaving the Blue Ribbon Bar, it may be observed that many individuals (e. g., the members of this court) would foresee injury as a natural and probable result if they undertook to ride spread-eagled atop a moving motor vehicle. But, our question is a legal, not a moral or philosophical, one; and, in its determination, we are tied to the facts of this case, with such inferences as reasonably may be deduced therefrom. Without repeating or restating the testimony heretofore recorded in much detail, suffice it to say at this point that we are unable to escape the conclusion that we should not and may not hold, *as a matter of law,* that *Ward* reasonably should have anticipated and foreseen injury, as a natural and probable consequence of his conduct. In addition to cases cited supra, see Life & Casualty Ins. Co. of Tenn. v. Benion, 82 Ga.App. 571, 61 S.E.2d 579, 581(4–6); Rodgers v. Reserve Life Ins. Co., 8 Ill.App. 2d 542, 132 N.E.2d 692; Travelers' Ins. Co. v. Clark, 109 Ky. 350, 59 S.W. 7. So concluding, we reject defendant's contention that it was entitled to a directed verdict.

In a second point, defendant assigns error in permitting plaintiff to testify that she had seen her husband (Ward) ride on top of motor vehicles and in permitting witness Thomson to testify concerning his ride on top of a 1958 Chevrolet station wagon (the same make and model of motor vehicle as that on which Ward rode on the night of his injury). Reception of this evidence is said to have been erroneous for three reasons, towit, (1) it "was improper rebuttal evidence because it did not rebut any evidence offered by appellant (defendant)," (2) "offered by respondent (plaintiff) for the reason that it tended to prove the safety of riding on top of automobiles, (it) was reversibly erroneous, being incompetent to show that such was free of danger," and

(3) "no proper foundation in the form of showing similarity of circumstances was laid prior to introduction of such testimony."

Defendant's argument on the first reason runs along the line that the evidence under consideration should not have been received in rebuttal because "defendant (had) offered no testimony that decedent (Ward) had *not* ridden on tops of automobiles before the night of his death, nor that a person could not under any circumstances do so safely"; but, as we think, this reflects an unduly circumscribed view of what plaintiff properly might have offered as rebuttal evidence in the particular circumstances of the instant case. Plaintiff made a prima facie case simply by showing Ward's violent death and, as is permitted in this category of actions, rested. Defendant, to whom the burden of going forward thereby shifted, then adduced evidence in support of its pleaded (and subsequently submitted) theory that Ward's death was a direct and proximate result of "his voluntary and wanton exposure to unnecessary and known danger" in riding on top of Murrell's station wagon, by reason of which "his death was neither unusual nor unexpected, and was the natural and probable consequence of said voluntary acts." At the conclusion of defendant's case, it became appropriate and proper for plaintiff thereafter to offer in rebuttal any competent evidence explaining, counteracting or repelling defendant's evidence and the inferences reasonably deducible therefrom. O'Brien v. Equitable Life Assur. Soc. of U. S., 8 Cir., 212 F.2d 383, 387, certiorari denied 348 U.S. 835, 75 S.Ct. 57, 99 L.Ed. 658; Sellars v. John Hancock Mut. Life Ins. Co., supra, 149 S.W.2d loc. cit. 406; 88 C.J.S. Trial § 101, p. 212; Id., § 99, p. 211. With plaintiff's right to recover vel non under the above-stated theory depending (as we have determined) upon the vital inquiry as to what Ward reasonably should have anticipated and foreseen as a natural and probable consequence of his conduct, we have no doubt but that plaintiff's testimony concerning Ward's previous rides on top of moving motor vehicles was relevant upon that vital inquiry and tended to counteract or repel defendant's evidence designed to convince the jury that Ward had exposed himself voluntarily and wantonly to such danger that his death was neither unusual nor unexpected but was the natural and probable consequence of his conduct; and, in our view, the testimony of witness Thomson (more particularly that, during his ride on top of a 1958 Chevrolet station wagon, he had experienced very little wind resistance, that there had been no movement or bouncing of his body, and that the top had formed "more or less a cradle"—"you are bedded down more or less into the top") was not wholly irrelevant upon the same vital inquiry, for it reasonably might have been inferred that Ward, having theretofore ridden on top of moving motor vehicles, would have had like knowledge when he climbed onto Murrell's station wagon behind the Blue Ribbon Bar. So, we think that the testimony of plaintiff and witness Thomson was not vulnerable to the complaint that it "was improper rebuttal evidence."

In support of the second reason under this point, defendant cites actions ex delicto such as Johnson v. Kansas City Public Service Co., 360 Mo. 429, 228 S.W.2d 796, and Gilbert v. Bluhm, Mo., 291 S.W.2d 125, 58 A.L.R.2d 1164 in which it has been held (as defendant's brief puts it) "that testimony of non-occurrence of other mishaps is not competent to show that the place of injury was free from danger." Quickly conceding here (as she did to the trial judge) that riding on top of a moving motor vehicle is not free from danger, plaintiff appropriately points out that the determinative question in this case was *not* whether Ward's riding in spread-eagled position on top of Murrell's station wagon was free from danger, but rather was whether riding in such position was *so* dangerous that Ward reasonably should have anticipated

and foreseen injury as a natural and probable consequence thereof. Cases cited by defendant in this connection are not here applicable or controlling.

Finally, defendant assails the evidence under discussion because "no proper foundation in the form of showing similarity of circumstances was laid." With respect to plaintiff's testimony concerning Ward's prior rides on other vehicles, defendant's *only* complaint for the quoted reason came in a motion to strike this answer, "well, actually there wasn't much to it, he (Ward) just rode on top of the car," *after* plaintiff in response to previous questions already had testified that she had seen her husband ride on moving vehicles. And, when the court suggested, without ruling defendant's motion to strike, that counsel should "bring out a little bit of the circumstances," the subsequent examination of plaintiff on this subject was conducted without further mention of the ground now urged. Thus, as to plaintiff's testimony, the present complaint for failure to show sufficient similarity of circumstances was not properly presented to or expressly decided by the trial court and should not be ruled here. V.A.M.S. § 512.160(1); Pierce v. New York Cent. R. Co., Mo., 257 S.W.2d 84, 88(5), and cases there cited. Regardless of that, we think that testimony concerning Ward's prior rides on moving vehicles would, without a showing of close similarity of conditions, have been relevant upon the vital inquiry as to whether, on the night of his death, he reasonably should have anticipated and foreseen injury as a natural and probable consequence of his riding spread-eagled on Murrell's station wagon.

The testimony of witness Thomson concerning his ride on a 1958 Chevrolet station wagon was experimental evidence, i. e., that of a witness who, after the occurrence giving rise to the suit, makes an experiment for the purpose of ascertaining the effect of certain action and then relates under oath the facts concerning such experiment. 2 Wigmore on Evidence (3rd Ed.), § 445, p. 432; State v. Harlan, Mo., 240 S.W. 197, 201. When experimental evidence is offered for the purpose of showing a thing's capacity or tendency to produce or not to produce an effect of a given character, the required similarity of circumstances is "a similarity in essential circumstances, or, as it is usually expressed, a *substantial similarity,* i. e., a similarity in *such circumstances or conditions as might supposably affect the result in question."* 2 Wigmore on Evidence (3rd Ed.), § 442, loc. cit. 425; J. Q. Lloyd Chemical Co. v. G. Mathes & Sons Rag Co., 145 Mo.App. 675, 690, 123 S.W. 528, 532. The only differences in the conditions under which Ward and witness Thomson rode, *which defendant mentions in this connection,* were (1) that Thomson drank no alcoholic beverage before he rode and (2) that he rode in daylight. But, we recall the testimony hereinbefore noted to the effect that Ward showed no indication of being under alcoholic influence and the trial concession of defendant's counsel that he could not argue Ward's intoxication for "there is no evidence of it," and we incline to the belief (with no suggestion to the contrary) that the only material factor relevant to the safety of a topside rider, upon which the time of day or night reasonably might be thought to have any substantial influence, would be the scope and clarity of the rider's field of observation, *if* he were looking ahead. Mindful that, "(i)n accordance with the fundamental principle that the object of all evidence is the ascertainment of the truth with reference to the existence or nonexistence of the facts in controversy, the criterion for the admissibility of evidence of experiments is whether such evidence tends to enlighten the jury and enable them more intelligently to consider the issues presented" [32 C.J.S. Evidence § 587, p. 440], that " '(u)nless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue' " [Biener v. St. Louis Public Service Co., Mo.App., 160 S.W.2d 780, 783], and

that the trial judge is accorded a substantial measure of discretion with respect to admission or exclusion of experimental evidence [Lynch v. Missouri-Kansas-Texas R. Co., 333 Mo. 89, 96–97, 61 S.W.2d 918, 921(3); Kerby v. Schindell, 235 Mo.App. 691, 697, 146 S.W.2d 670, 673(4)], we conclude that the differences in the conditions under which Ward and witness Thomson rode were not such as to compel rejection of Thomson's experimental testimony and, upon admission of such testimony, were for the jury in evaluating the weight to be accorded it [Faught v. Washam, Mo., 329 S.W.2d 588, 598; Carpenter v. Kurn, 348 Mo. 1132, 1138, 157 S.W.2d 213, 215(3); Griggs v. Kansas City Rys. Co., Mo., 228 S.W. 508, 511–512(6)], and that we may not find prejudicial error, in any respect preserved and assigned by defendant, in the admission of witness Thomson's testimony concerning his ride. Cf. Williams v. Thompson, Mo., 251 S.W.2d 89, 91.

The judgment is affirmed.

RUARK, P. J., and McDOWELL, J., concur.