**Viola SARTAIN, Respondent,**

v.

**NATIONAL LIFE AND ACCIDENT IN-
SURANCE COMPANY, Appellant.**

**No. 24994.**

Kansas City Court of Appeals.

Missouri.

Dec. 2, 1968.

Robert F. Redmond, III, Kansas City, for appellant, Terrell, VanOsdol & Magruder, Kansas City, of counsel.

Robert L. Rodarte, Kansas City, for respondent.

HOWARD, Presiding Judge.

This is a suit to recover additional benefits for accidental death under an insurance policy issued by appellant to William R. Sartain, the deceased husband of respondent. Trial to the court without a jury resulted in a judgment in favor of Viola V. Sartain as beneficiary under the insurance policy in the amount of $1,000.00. Appellant has duly appealed to this court. We shall refer to the parties as they appeared below.

No question is raised that the policy was duly issued and in force at the time of Mr. Sartain's death and the company has paid the normal death benefit. The policy provided for the payment of an additional benefit in the amount of $1,000.00 upon proof "that the death of the Insured resulted directly, and independently of all other causes, from bodily injuries effected solely through external, violent and ac-

cidental means". The sole question raised on this appeal is whether the evidence supported the decision of the trial court that Mr. Sartain's death resulted from accidental means. About 3:00 p. m., on Saturday, January 30, 1965, Mr. Sartain left his home in Kansas City, Missouri. The weather was very cold that day and the temperature dropped to near zero that night. About 6:00 p. m., Raymond E. Bradley, who ran a neighborhood tavern, was informed that Sartain was asleep in his car which was parked across the street from the tavern. Bradley went to the car and saw Mr. Sartain, whom he knew, inside the car. He was in his shirt sleeves; was wearing trousers and shoes but no coat. It was then about ten degrees above zero. The car engine was not running. Bradley woke Mr. Sartain and told him to go home. He answered him "Okay. Ray." Bradley could not tell whether or not he was intoxicated; he stated Mr. Sartain acted "just like he had been asleep." About 7:00 p. m., Mr. Sartain's car was still there and Bradley again went to the car and woke him and told him to go home and Mr. Sartain answered "All right." About 8:00 p. m., Bradley again went to the car and woke Mr. Sartain and told him to go home and Mr. Sartain made the same reply. At no time did Bradley open the car door but "hollered" through the door at Mr. Sartain.

Shortly after this eight o'clock trip, the car departed. About 8:30 or 8:45 p. m., a young man by the name of William Sims got off work at a grocery store in the neighborhood of the tavern. The exact locations are not pinpointed and the testimony is somewhat confusing. However, it appears that Sims encountered Mr. Sartain within a block or so of the tavern. He testified "he got out and staggered over to me and fell upon me, and grasped me, reached for me and fell onto me." Mr. Sartain asked Sims to drive him (Sartain) home. Sims refused because he didn't know who Sartain was, but offered to help him walk home if he did not live too far. They walked about a block and

a half, going west on 24th Street and about three doors south on Lister, when Sims recognized Sartain as the father of one of his schoolmates. He then realized that they were going in the opposite direction from the Sartain home. They had walked west on 24th and south on Lister at the direction of Mr. Sartain who stated that he lived two or three blocks off of Lister. When Sims told him that they were going in the wrong direction, Mr. Sartain argued that he lived in the direction that they were going.

The streets and sidewalks were a solid sheet of ice and snow and Sims had been holding Mr. Sartain to keep him from falling. When they disagreed as to where Mr. Sartain lived, Sartain pushed Sims away and fell to his knees when he tried to walk by himself and fell on his face in the snow. Sims helped him up and got him seated on some steps in front of the third house from the corner of Lister and 24th Streets. Sartain gave the keys to his car to Sims who told Sartain that he would go and get the car and come back and get Sartain. Sims could not get the car started until a passing motorist gave him a push. He then drove back to where he had left Mr. Sartain; got out of the car and looked for him but could not find him. He had been gone five to ten minutes. When he got back to where he had left Mr. Sartain, the car's heater was working and the car was warm inside.

When Sims could not find Mr. Sartain, he drove the car to the Sartain home and asked for assistance from someone who was old enough to have a driver's license to go back and look for Mr. Sartain. Sims only saw the youngest Sartain boy, who was too young to drive, who advised there was no one else present; he told Sims to take the car back to the tavern and leave the car there and that the police would pick up Mr. Sartain before morning. Sims returned the car to the tavern as directed.

At 12:58 a. m. the following morning, the man who lived in the house at 2417

Lister found Mr. Sartain lying on his side but face down in the snow. This is in the same block as the house in front of which Sims left Sartain but it is not clear whether it is the same house. The police were called and they were dispatched at 1:06 a. m., January 31, 1965. Mr. Sartain was taken to the hospital where he was pronounced dead on arrival at 1:30 a. m. An autopsy revealed that Mr. Sartain was in good health and there was no disease or injury to account for his death. It was determined that he died from exposure. A blood sample was taken which, when analyzed, revealed an alcoholic content of .35 per cent.

Dr. Wheeler, the coroner, testified there were abrasions at the corner of the lower lip, on the side of the face, on the chin and over the eyebrows. He stated that "the abrasions were sym(m)etrical suggesting that they were received when he fell face down." He was asked "Do you have any opinion based on your examination as to how this person happened to die from exposure?" He answered "I believe he fell in the snow and was unable to get up, and froze to death." As to alcoholic content of the blood, he answered "it's usually considered high enough to cause a dazed condition." As to the force of the blows that caused the abrasions to the head and face, he testified "He certainly sustained some force as he went down; how much force he sustained, I cannot say." He testified that the scratches or lacerations themselves would not have rendered Mr. Sartain unconscious. He classified them as superficial.

The final diagnosis in the autopsy report listed the cause of death as exposure and contributory factors as acute alcoholism. When testifying, the coroner stated "I feel that the fall on the snow could have been a contributing factor."

Two adult sons of Mr. Sartain viewed the body at the morgue before the autopsy. They testified in more detail as to the abrasions and bruises. They testified that there was a cut on the forehead over the left eye; a cut on the chin; his nose was all red, and a cut on the left cheek. One of his shoulders was bruised. The cut on the chin was all the way through. One of them testified without objection that the mortician told him "the lips were all beat up, nothing but wax." Also his knees were bruised and there were signs of blood on the chin and face.

Defendant argues that Mr. Sartain intentionally got drunk and that his freezing to death was a natural consequence thereof and cannot be said to be accidental. It argues that Mr. Sartain was drunk before Bradley told him to go home the first time at 6:00 p. m.; that he was in an unheated car in extremely cold weather in his shirt sleeves at least from 6:00 p. m. to 8:30 or 8:45 p. m., when Sims saw him; that the fall or falls were the result of his drunken condition, and concludes that his death from exposure was the natural result of his intentional acts of getting drunk and exposing himself to extreme cold. Defendant argues that the natural consequences of an intentional act cannot constitute death by accidental means within the provision of the insurance policy.

Defendant relies on the case of Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W. 907, 39 A.L.R. 56, as demonstrating that the Missouri rule on such question is that an injury or death from accidental means must be the result of an accidental cause; not an unexpected or unusual result of intentional and voluntary acts. This, as contrasted with the rule in some other states that an unexpected result of an intentional act constitutes death by accidental means. In the Caldwell case, the court expressed this rule as follows, l. c. 921:

"* * * where the means which causes the injury was voluntarily employed in the usual and expected way, the resulting injury is not produced by accidental means, even though such re-

sulting injury is entirely unusual, unexpected, and unforeseen."

This case points out that the words "accidental means" are equivalent to "cause" and do not relate to unusual or unexpected results. See also Ward v. Penn Mutual Life Insurance Company, Mo.App., 352 S.W.2d 413.

In this case there is no evidence as to when Sartain drank any intoxicating beverages. The only evidence is that Sims testified that Sartain was drunk when he was trying to help him walk home. We do not know whether or not the heater in the car was operating when Sartain was asleep in the car. Bradley did not open the door and did not know whether the car was warm or not. The motor was not running when he made his first trip to the car. However, Sims testified that after he got the car started by being pushed, he drove about a block and a half to the point where he had left Sartain and that when he got there the heater was on and the car was warm by then. From this, the trier of fact could infer that the car's heater had been operating for an appreciable period of time shortly prior to the time Sims encountered Sartain. One cannot drive a cold car in near zero weather a distance of a block or two and have it warm inside.

From the foregoing evidence, the trier of fact could reasonably infer that Sartain drove his car from the place where it was parked across from the tavern to the place where he encountered Sims. It would also be reasonable to infer that difficulty with the car developed since Sims had to be pushed to start the car. Sims refused to drive the car but took Sartain from the relative safety of the car into near zero weather when Sartain did not have a coat and walked him a block and a half from the car where he left him after Sartain had once fallen on his face in the snow. This action of Sims could well be held to be an intervening action of some human agency other than the act of the insured himself as discussed in Ward v. Penn Mutual Life Insurance Company, Mo.App., 352 S.W.2d 413. In that case, the court said:

" * * * Particularly in situations of this character where 'some human agency other than the act of the insured himself has entered into the doing of the things which produced the ultimate result' [Camp v. John Hancock Mut. Life Ins. Co., supra, 165 S.W.2d 277, loc. cit. 281], the reported cases in this and other jurisdictions (many of which are cited in instant defendant's brief) alike attest the overriding importance of the question as to whether the insured reasonably should have anticipated and foreseen injury as a natural and probable consequence of his voluntary action. So, in ruling instant defendant's earnest contention that it was entitled to a directed verdict, the determinative question becomes whether we may say, *as a matter of law,* that, when Ward assumed a spread-eagled position on top of the station wagon, he reasonably should have anticipated and foreseen, as a natural and probable consequence of his action, that in Murrell's driving of the station wagon to the Twilight Inn he (Ward) would be dislodged from his position and thereby might sustain injury or death."

We believe that the trier of fact in the case at bar could reasonably find that the actions of Sims could not have been reasonably foreseen by Sartain and that the consequences of Sims' action would not be the natural and foreseeable results of Sartain's voluntary intoxication.

Sims did not mention any blood on Sartain's face although it is a reasonable inference that the injuries to Sartain's face and head would have caused bleeding and his sons testified to blood around his face and chin. From these facts and from the evidence of the injuries observed by the coroner and by the sons, it would be reasonable to infer that Sartain fell in the snow on more than one occasion and

we must remember that he was found face down in the snow. It is undisputed that the footing was treacherous because everything was covered with ice and snow.

 As stated in Callahan v. Connecticut General Life Insurance Company, 357 Mo. 187, 207 S.W.2d 279, l. c. 284, the extreme cold weather was an extraneous or foreign force with which the insured (Sartain) "is not necessarily legally chargeable." Furthermore, until Sartain was led away from his car by Sims, we cannot say that he voluntarily exposed himself to the cold because of the evidence of the operation of the car's heater, and the warm condition of the car as testified to by Sims. Likewise, Sartain's falling on his face on more than one occasion cannot as a matter of law be chargeable to his drunken condition in view of the ice and snow underfoot. The coroner testified that Sartain would have received a blow to the head when he fell but he did not know the amount of force of the blow, and the fall in the snow could have been a contributing factor to the death. The trier of fact could have inferred that the force necessary to inflict the injuries described by the sons was sufficient to have stunned Sartain so that the cold had an opportunity to take over and result in his death. The coroner testified that without protective clothing a man could die from exposure in an hour or less if there was a wind.

Thus, as intervening causes, we have the difficulty with the operation of the car, the intervention of another person when Sims led Sartain away from his car, see Ward v. Penn Mutual Life Ins. Co., Mo.App., 352 S.W.2d 413, supra, and the falls on the ice producing injuries, all of which culminated in death from exposure. On this basis, the trier of fact could reasonably find that the death from exposure was not the natural consequence of Sartain's intentional act of becoming intoxicated.

Civil Rule 73.01, V.A.M.R., provides that on our review of court tried cases "The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Although we do review this case upon both the law and evidence as in suits of equitable nature, we cannot say in view of the foregoing that the judgment of the trial court is clearly erroneous and we therefore affirm the judgment below.

All concur.