Minerva APPLEBURY, Plaintiff-Appellant,

v.

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant-Respondent.

No. 23915.

Kansas City Court of Appeals.

Missouri.

June 1, 1964.

Ben E. Pener, Harry D. Pener, Clancy D. Tull, Kansas City, for appellant.

William H. Woodson, Kansas City, Spencer, Fane, Britt & Browne, Kansas City, of counsel, for respondent.

MAUGHMER, Commissioner.

This is a suit by Minerva Applebury, grandmother of Charles F. Schwaneke, to

collect the $2500 double indemnity benefit for death by accidental means as provided in a life insurance policy on his life issued by defendant John Hancock Mutual Life Insurance Company.

The parties stipulated in open court that: Charles F. Schwaneke, the insured, died in an automobile collision at the intersection of 27th and Spruce Streets, Kansas City, Missouri, at about 1:20 a. m. on July 14, 1959. At the time of his death a life insurance policy issued by defendant providing payment of $2500 for death by accidental means was in full force and effect; the plaintiff, Minerva Applebury, was the designated beneficiary therein and proof of loss has been made.

In addition to the stipulation, oral testimony by both plaintiff and defendant was received. The cause was submitted and the jury returned a verdict for defendant. Plaintiff prosecutes this appeal.

At about 1:00 a. m. on the morning of July 14, 1959, Charles F. Schwaneke, the insured, alone in his red and while Buick automobile, was driving in an easterly direction on Pershing Road near Main Street, in Kansas City, Missouri. Officer Austin of the Kansas City Police was in the vicinity in a police cruiser automobile. Austin saw Schwaneke skid his wheels for about 10 feet at the intersection and then proceed east on Pershing Road at 60 to 65 miles per hour. The lawful speed for the time and place was 25 miles per hour. Austin said the Buick "then made an approximately 45 degree left turn to Cherry, proceeded south on Cherry to 28th Street at speeds of approximately 60 miles per hour and then made a left turn on 28th Street". At this time Austin, by radio, called for another officer to assist and said he was going to stop the Buick. The police dispatcher was also notified. At 27th and Harrison, Officer Austin, with his red light on and siren sounding, attempted to stop Schwaneke, who pulled to the right and slowed, but did not stop. Then said Austin "He shot past me to my right and at ex-

cessive speed and I pursued * * *. We proceeded east bound on 27th Street to Paseo * * *. We had reached speeds between 80 and 90 miles an hour". Other officers unsuccessfully attempted to set up a road block at 27th and Indiana. Austin said he had his red light on and siren going from 27th and Harrison on; that he was traveling from 80 to 90 miles per hour but lost ground to the Buick.

Officer Hill, Kansas City Police, was on midnight shift in the accident investigation car and was cruising in the vicinity of 27th and Indiana when he "overheard this car chase on the radio". Hill and another officer set up a partial road block but the Buick went through, traveling from 70 to 80 miles per hour. These officers took up the chase, moving 80 to 90 miles per hour, but did not catch up with Schwaneke.

The chase ended suddenly and violently at the intersection of 27th and Spruce Streets. It had covered some 46 blocks, or approximately five miles. Anthony Ragusa owns and operates Palace Liquors at 27th and Benton. He was getting ready to close when he heard the Buick pass and later heard the crash and collision. He estimated the Buick's speed at 90 to 100 miles per hour. Marion Robertson was night operator of a service station at 27th and Spruce. He said that shortly after 1:00 a. m. a Chevrolet automobile pulled up to the gas pump. There were three boys or young men in the car. They bought $2 worth of gas. They drank some beer. Robertson said these people remained in the service station about 15 minutes and then got into the Chevrolet and drove into the intersection slowly at a speed of only a few miles per hour. Their car was hit almost head-on by Schwaneke's Buick coming down 27th Street. Robertson estimated he was only about 20 feet from the point of collision. Schwaneke and the three occupants of the Chevrolet were killed.

As her case in chief, plaintiff presented only proof that the insurance was in force, she was the beneficiary, the insured

died in the automobile collision and defendant had refused payment. This made a prima face case of death by accidental means. Sellars v. John Hancock Mut. Life Ins. Co., Mo.App., 149 S.W.2d 404, 405; Ward v. Penn Mutual Life Ins. Co., Mo. App., 352 S.W.2d 413, 419. However, the showing of violent death while sufficient to make a prima facie case is not *evidence* of the presumed fact, but only a rebuttable legal presumption which procedurally shifted the burden of going forward to the defendant. Ward v. Penn Mutual Life Ins. Co., supra. The burden of proof to establish each and every essential element of her cause of action rests upon plaintiff and so remains until the end of the case. Caldwell v. Travelers Ins. Co., 305 Mo. 619, 267 S.W. 907, 39 A.L.R. 56; Gennari v. Prudential Ins. Co., Mo., 335 S.W.2d 55, 60.

`We set out the particular insuring clauses respecting the additional benefit for death by accidental means with which we are concerned in this case. The company contracted to pay if "the death of the Insured was caused directly and independently of all other causes, by a bodily injury sustained solely by external, violent and accidental means * * *". "The company shall not be liable * * * (3) if such death results, directly or indirectly, or wholly or partially, * * * (iv) from committing an assault or felony". There is no specific exception in the policy exempting the company from liability if the death was the result of voluntary and wanton exposure to unnecessary and known danger.

■ At the outset we must understand that "means" as used in the policy is equivalent to "cause". Callahan v. Connecticut General Life Ins. Co., 357 Mo. 187, 207 S.W.2d 279, 283; Ward v. Penn Mutual Life Ins. Co., supra, 352 S.W.2d l. c. 420.

It is plaintiff's position that the insured's death resulted from the automobile collision (which is conceded), that the collision was an accident, the death was caused by "accidental means" within the terms of the policy, and therefore defendant is liable. De-

fendant, while admitting the collision was the final occurrence which resulted in the death of the insured and three others, denies that the death was caused by "accidental means" within the meaning of the policy and within the meaning of that phrase as it has been defined by the appellate courts.

Defendant denied liability on three specific grounds: (First) the insured at the time of his death was in the commission of an assault upon the three persons in the Chevrolet who were killed and this being so, the company is by specific written exception exempted from liability; (Second) the insured was at the time guilty of and had committed a felony, namely, manslaughter—also a specified exemption, and (Third) Schwaneke died as a direct and proximate result of voluntarily and wantonly exposing himself to unnecessary and known danger and therefore his death did not result from "accidental means".

There are two lines of decisions with respect to "accidental means" being distinguishable from "accident" or "accidental death". One group holds the terms to be legally synonymous and makes no distinction. The other group distinguishes between cause and effect and recognizes that even though an injury (result) may be unexpected, unforeseen or even unusual, it does not occur (cause) by accidental means if the means causing the injury has been employed by the insured voluntarily in the usual and expected way. Caldwell v. Travelers Ins. Co., 305 Mo. 619, 267 S.W. 907, 921, 39 A.L.R. 56; Ward v. Penn Mutual Life Ins. Co., supra, 352 S.W.2d l. c. 420. In 45 C.J.S. Insurance § 753b, pages 779, 780, it is defined or explained this way: " * * * if the death or injury, although unforeseen or unexpected, results directly from insured's voluntary act, unaccompanied by anything unexpected, unusual, or unforeseen, it is not death or injury by accidental means, although the result may be such as to constitute an accidental injury". Missouri decisions are in accord with the second group.

Our appellate courts have held that death occasioned by sunstroke, constitutes death from external, violent and accidental means. Other jurisdictions have approved recoveries where "Insured, walking home from work in 20 degrees below zero weather, stopped at his daughter's home and died within a few minutes". Commonwealth Casualty Co. of Philadelphia v. Wheeler, 13 Ohio App. 140, 148. Insured alighted from street car at wrong stop in very cold weather and was found a short distance from home the next morning frozen to death. Wills v. Midland Nat. Life Ins. Co., 108 Mont. 536, 91 P.2d 695, 698. An automobile broke down and insured froze to death while walking in sub-zero weather. Federal Life Ins. Co. v. White (Texas Civ.App.) 23 S.W.2d 832.

However, in Inter-Ocean Casualty Co. v. Foster, 226 Ala. 348, 147 So. 127, 129, 130, Insured's automobile gave out of gas on the road and to protect it against theft he stayed with it for three days and nights in severe Alabama weather, freezing his feet, from which death ensued. Recovery was denied because deceased voluntarily exposed himself to the cold in circumstances which reasonable and ordinary prudence would pronounce dangerous. The court said: " * * * freezing is not of itself an accident, but becomes so only when 'joined with a fortuitous, unusual, unexpected circumstance or event', which operating upon the cold weather as a condition produces the result as a proximate consequence of such fortuitous circumstances". There are many reported cases where recovery was denied on the theory that an intoxicated person is held to intend the probable and natural consequences of his acts.

We are cognizant of the rule that wherever an insurance contract is open to different constructions, that most favorable to insured must be adopted. We think that rule is of little help to the plaintiff here. Counsel for appellant also cites Appleman Insurance Law & Practice, Sec. 531, as follows: "In the absence of any relevant policy exclusion, the law is that the voluntary exposure of the insured to danger or his failure to exercise diligence in avoiding perils does not affect the right to recover under a policy". This statement refers to the ordinary policy of life insurance and not where "accidental means" is involved.

We shall briefly summarize the facts and results in three Missouri cases. In Callahan v. Connecticut General Life Ins. Co., 207 S.W.2d 279, the insured intentionally stayed in his stalled automobile in sub-freezing weather for 24 hours, suffered frozen feet and died of tetanus. The Supreme Court opinion stated that insured violated no law when he remained in his automobile, called attention to the testimony that there was not any "particular danger" in just sitting in the car with the temperature in the twenties, and ruled the issue in this case and under these facts was for the jury.

In Gennari v. Prudential Ins. Co of America, supra, 335 S.W.2d 55, insured was a pastry cook and part-time carver of ice table decorations. He was commissioned to prepare ice-carvings for a country club and entered a walk-in icebox to do the work. The temperature inside the icebox ranged from 31 to 34 degrees. Outside it was 102 degrees. He worked for more than an hour, suddenly put down his hammer and chisel and left the refrigerator. He took about twelve steps and staggered. He was taken to a hospital, had a temperature of 101, which rose to 105.4 by midnight. He died 10½ hours after coming out of the icebox. This case is not precisely in point because the company contended that the death was occasioned by disease (cerebral hemorrhage due to cardiovascular disease) and that the heat or sudden switch from cold to hot played no part in the death. However, the court specifically ruled the burden was on plaintiff to prove the death resulted from accidental means, that the defense of death from cerebral hemorrhage was not an affirmative defense but rather "an assertion that he did not die of accidental means". (l. c. 61). The verdict in the Gennari case was for the defendant.

The Supreme Court ordered a new trial (4 to 3 decision) because of two erroneous instructions.

The opinion of the Springfield Court of Appeals in Ward v. Penn Mutual Life Ins. Co., supra, 352 S.W.2d 413, reviews almost the whole field of this type of litigation. There the insured and his companions had visited and imbibed at several taverns. When they left the last one insured insisted upon riding spread-eagle and flat on top of the automobile which one of his companions would be driving. Insured was young, strong, over six feet tall and had ridden on top of automobiles before without suffering injury. The driver started off with insured riding on top. He fell off and was found lying in the road dead. The car occupants did not see, hear or know he had fallen. There was no evidence that either insured or the driver was intoxicated. It was the defendant's contention that insured's death was a direct and proximate result of voluntary and wanton exposure to unnecessary and known danger, so that his death was neither unusual nor unexpected, but was the natural and probable consequence of such voluntary act. The court ruled here, too, that this was not an affirmative defense which placed the burden on defendant, but rather was simply a disavowal that insured's death had resulted from accidental means. The trial court instructed the jury that if insured's death was a direct and proximate result of "his voluntary and wanton exposure to unnecessary and known danger because of (describing his act of riding spread-eagled) his death was neither unusual nor unexpected and was the natural and probable consequence of said voluntary acts". At page 420 of the opinion the court said:

"If defendant had adduced positive, clear and certain evidence, in no material respect self-impeaching, which plainly revealed the circumstances under which insured had been injured, convincingly showed that such injury was not by accidental means, and fairly afforded no reasonable basis for a contrary conclusion, numerous reported cases in this jurisdiction demonstrate that a verdict for defendant properly might have been directed * * *".

In the Ward case the verdict was for plaintiff and the appellate court in view of insured's having ridden spread-eagle before, in the face of testimony that others had done so, refused to hold as a *matter of law* that the death was not by accidental means, and therefore refused to order a directed verdict for defendant, but rather affirmed the judgment.

Now as to our particular case. Plaintiff insists that defendant's given Instruction No. 3, directing the jury to find for defendant if the insured "died as a direct and proximate result of voluntarily and wantonly exposing himself to unnecessary and known danger", amounted to reversible error. She contends (1) It submits an affirmative defense; (2) It submits a defense which is improper unless the policy itself contains a specific exception thereof, and (3) It is a clear misstatement of the law. It should be here noted that this Instruction No. 3 is almost identical with the instruction which we have referred to and which was approved in Ward v. Penn Mutual Life Ins. Co., supra. We incorporate Instruction No. 3 in this opinion:

"The Court instructs the jury that the burden is on plaintiff to prove by a preponderance or the greater weight of the credible evidence that the death of Charles F. Schwaneke was caused directly by a bodily injury sustained by accidental means.

"The Court further instructs the jury that if you find and believe from the credible evidence that immediately before his death at about 1:30 a. m. on July 14, 1959, as a result of the collision mentioned in the evidence on 27th Street near its intersection with Spruce Street in this city, Charles F. Schwaneke was driving a motor vehicle east on 27th Street at a rate of speed in excess

of 60 miles per hour and you further find and believe that Charles F. Schwaneke while then and there operating the automobile at such a rate of speed, if you so find, reasonably should have anticipated and foreseen, as a natural and probable consequence thereof that he was likely to sustain bodily injury or death, and that Charles F. Schwaneke died as a direct and proximate result of voluntarily and wantonly exposing himself to unnecessary and known danger, by operating the motor vehicle at such speed, if you so find, then, the death of Charles F. Schwaneke did not result from accidental means and your verdict should be for defendant and against plaintiff".

■ The opinions and conclusions in the cases reviewed hereinabove demonstrate that plaintiff's objections are not well taken. The defense presented by Instruction No. 3 is not an affirmative defense, which shifts the burden of proof, it is not one which is unavailable absent a specific policy exclusion and it does not misstate the law. In this connection we shall make reference to plaintiff's Instruction No. 1, which was prepared and offered by plaintiff, and which the court gave. This instruction, after requiring a finding of the formal essential elements, closed with the prerequisite conditions which must be met before plaintiff could have the verdict. We quote the last part of plaintiff's Instruction No. 1:

"* * * and if you further find and believe from the evidence that the death of deceased by accidental means did not result directly or indirectly, or wholly or partially, from committing an assault or a felony, nor as the direct, proximate, natural, probable and foreseeable result or consequence of his own acts in operating said automobile in a careless, negligent, willful, wanton and unlawful manner, if you so find; then the Court instructs the jury that you

will return a verdict in favor of the plaintiff and against the defendant".

This quoted part of Instruction No. 1 might be said to be almost the converse of defendant's Instruction No. 3, and vice-versa. Plaintiff's Instruction No. 1 recognizes and instructs on the defense of voluntary and wanton exposure to unnecessary and known danger. It is difficult, we think, for plaintiff to predicate error on defendant's instruction which varies but little, if any, from his own, as to the law declared and the factual findings required as a verdict basis.

■ During its deliberations the jury put some questions to the court. The court responded: "You are bound by the instructions". There was no error or abuse of discretion in this respect and appellant's second assignment is overruled.

■ Defendant's three separate defenses were submitted in three separate instructions. Each instruction first hypothesized the insured's speed as in excess of 60 mile per hour and then presented its defense of (1) assault, (2) felony, and (3) voluntary exposure to known danger. We believe defendant had the right to submit these three defenses separately and the court did not err in so instructing. Appellant's contention that the mentioning of "speed in excess of 60 miles per hour" overemphasized the question of speed is particularly untenable in this case where the speed was not only overwhelmingly proved, but actually exceeded 60 miles per hour during most of the chase. The assignment is denied.

If this case had come up on appeal from a verdict for plaintiff and we were asked to declare as a *matter of law* that plaintiff is not entitled to recover, a more difficult question would be presented. However, we believe that of all cases reviewed in this opinion this is one of the strongest for the defense. Here there can be no doubt but that insured was in violation of the law for some minutes before the crash. This element is absent in most of the cases. The

evidence is very persuasive that insured was guilty of assault and manslaughter. This feature is usually absent in such cases. And, finally, driving an automobile along city streets and intersections, even late at night and knowingly running from the police is, we think, a voluntary and wanton exposure to danger.

We need not determine if plaintiff failed to make a submissible case as a *matter of law*. The jury returned a verdict for defendant. That verdict is supported by substantial, credible evidence. We find no reversible error.

The judgment is affirmed.

SPERRY, C., concurs.

PER CURIAM:

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.