**FARMERS INSURANCE EXCHANGE,**
Respondent,

v.

**Malcolm PETERS et al., Appellants.**

No. 56918.

Supreme Court of Missouri,
Division No. 2.

Dec. 10, 1973.

Schroff, Keeter & Glass, Robert W. Schroff, Bob J. Keeter, Springfield, for respondent.

J. W. Grossenheider, Lebanon, for appellants.

MORGAN, Judge.

Farmers Insurance Exchange, hereinafter referred to as the insurer, filed a declaratory judgment action to have resolved the extent of its obligations (coverage) with respect to one of its policies issued to one Malcolm Peters on a certain automobile, after the automobile was involved in a violent crash wherein the driver (insured's son) and a passenger were fatally injured. Named defendants included all of those persons qualified to assert a claim against the insured or insurer. The cause was tried to the court and, thereafter, "findings of fact and conclusions of law" were entered wherein it was concluded that there was no coverage and the insurer had no exposure whatever. Judgment was entered accordingly and defendants, potential claimants, have appealed. We affirm.

We first look to the policy, and endorsements thereon, which the insurer had issued to specify the obligations assumed in consideration for the premiums received. For our present purposes, it can be said that the basic policy was that generally sold and issued to owners of automobiles. Of immediate concern is one exclusion therein which provided, to wit: "The insurance afforded under Parts I [Liability], II [Uninsured Motorists], III [Medical], and IV [Comprehensive and Collision] does not apply under any of the coverages * * * (2) *while the automobile is being operated by any person in any prearranged race or competitive speed test.*" (Bracketed material and emphasis supplied.)

Attached to the policy is an endorsement entitled, in part: "Automobile Accidental Death Indemnity . . ." It called for the payment by the insurer of $5,000 upon the death of either the insured, his wife or the son of the insured, if such death resulted directly from bodily injuries "caused by accident." In connection with the death benefit endorsement, we dispose of one preliminary problem. The insurer submits that this additional coverage was also excluded by the "prearranged race" exclusion, and relies on that portion of the endorsement which provided: "The company agrees with the named insured . . . [to pay the death benefit]. . . . subject to the . . . exclusions . . . of this endorsement and of the policy." However, we look further to other terms of the endorsement covering the death benefit, admittedly somewhat gratuitously, and find the following: "Policy Provisions. None of the . . . exclusions . . . of the policy shall apply to the insurance afforded by this endorsement except [thereafter are listed certain exclusions and conditions not relevant in this case]." The ambiguity is obvious; but, in view of the final disposition we must make of any possible claim under the endorsement, it is sufficient to say that "if the contract is reasonably susceptible of two or more interpretations that one which will sustain the insured's claim must be adopted, since the language used in the policy is that of the insurer." Reese v. Preferred Risk Mutual Insurance Company, 457 S.W.2d 205, 207 [1–3] (Mo.App.1970). Therefore, we rule that the "death benefit" called for by the endorsement was not affected by the "prearranged race" exclusion of the policy—thus leaving the question as to whether or not the factual situation presented falls within the coverage provided by the endorsement.

Factually, it appears that the son of the insured was driving the family automobile on the evening of February 1, 1970, in Leb-

anon. That he and the passenger, as well as others, met shortly before midnight and agreed to engage in automobile races. The evidence indicates the passenger had done some mechanical work on the automobile. They left Lebanon on State Highway No. 32, and when about five miles into the country held one race. A decision was made that the road conditions there were not proper for racing; and the participants, including spectators, continued on about twenty miles from Lebanon where they reached the site of the ill-fated race. Pictures of the area were in evidence, and it seems agreed that the race was to cover a flat strip of highway across the bottom and end at the bridge crossing the Gasconade River; and, such exhibits also show that immediately after crossing the bridge the highway makes a sharp turn to the left. The son lined up the insured's automobile with that of another—pointing toward the bridge—and a spectator started the race by a hand signal. The son pulled ahead, at speeds estimated at 80 to 100 miles per hour, and crossed the bridge. Shortly thereafter the spectators saw a "sort of red explosion." They rushed to the scene and found that both the driver and passenger had been thrown from the automobile, which was in flames in the ditch on the outside of the curve.

*First*, in connection with the death of the passenger, we consider whether or not the insurer has any contractual obligation to defend against any claim brought under the "liability" provisions of the policy. Claimants thereunder admit "that a prearranged speed race was held" and rely solely on the argument that the incident occurred *after* the race was over, and thus, that the race exclusion was not operative at the moment of the passenger's death. There is no dispute but that the automobiles involved had crossed the agreed *finish line* prior to the catastrophe.

Was the automobile engaged in a race at the time of the casualty? This court has not considered the question, and the few cases dealing with somewhat similar exclu-sions have such differing factual situations "that no general rule of law can be formulated respecting their construction." 23 A.L.R.3rd 1444. Claimants submit that the excluded coverage applied solely "while" the race was on, and that when the participants crossed the finish line a winner had been determined and no longer was there a race. Although not cited by claimants, support for their position may be found in American Standard Insurance Co. of Wis. v. Tournor, 186 Neb. 585, 185 N.W.2d 267 (1971) wherein a similarly worded exclusion was considered. In a four to three opinion, the majority said: "The word 'while' connotes a specific segment of time. The word 'in' can mean 'in the course of' or 'during.' Either construction terminates the exclusion at the identical time the excluded event terminates. Such a construction is particularly indicated when a noncommercial race is held on a public highway, where policy coverage is specific and intended both before and after the occurrence of the excluded race." Those judges dissenting said, in part: "In a drag race, the engagement in the race may involve more than occurs over the designated course. If two cars are to approach the starting line at a designated speed, the approach is also part of the race. In view of the fact that in a race the participants cannot stop immediately at the finish line, it seems that the slowing down and stopping is also essentially a part of the race although this occurs beyond the finish line. The cars are still being *used* in a race or speed contest although the winner had been determined." Claimants also cite two cases decided in Alabama, to wit: Alabama Farm Bureau Mutual Cas. Ins. Co. v. Cofield, 274 Ala. 299, 148 So.2d 226 (1962) and Alabama Farm Bureau Mut. Cas. Ins. Co. v. Goodman, 279 Ala. 538, 188 So.2d 268 (Ala.1966). Neither case considered the answer to the precise question herein posed although similar exclusionary clauses were involved. In Cofield coverage was found because the races had been terminated sometime before, and in Goodman the exclusion was found applicable because the

casualty occurred while the race was still being contested. In connection with the latter case, we note that the insurer adopts language therein to stress the meaning and intent of the exclusionary language. For instance, at 188 So.2d, page 270, the court said: "These words express excessive speed and an increased risk and situations in which an automobile is not usually found or entered by the ordinary owner or driver." Insurer submits that the most dangerous part of racing is slowing down, a fact testified to by a professional racer in this case, and that the excluded excess danger created by a race continues until the automobile is slowed to a normal highway speed.

In Mulconery v. Federal Automobile Insurance Association, 230 Ill.App. 236 (4th Dist. 1923), the result turned on a finding that there had been no speed test. The result in Krempel v. Noltze, 41 Wis.2d 454, 164 N.W.2d 227 (1969), was dictated by a statutory prohibition against such an exclusion. In Andreassen v. Esposito, 90 N.J.Super. 170, 216 A.2d 607 (App.Div. 1966), the casualty occurred after one participant had clearly withdrawn, and the court said, l. c. 609 [2]: "The critical consideration was whether, notwithstanding his physical location, results naturally and proximately ensuing from his [the driver's] conduct continued to operate in production of the accident." A comparable approach was taken by the court in Lemons v. Kelly, 239 Or. 354, 397 P.2d 784 (1964), wherein the court found that the controlling issue was one of causation for resolution by the jury and one element for consideration was whether or not the "excitement and stimulus created by the race" had been dissipated prior to the casualty. Consideration of such a subjective element is of little value where all occupants of the automobile involved are deceased.

■ From all of which, we must decide the issue in this case; and, in doing so, we have reached the following conclusions: (1) That absent any statutory prohibition against the same, it was within the province of the insurer to exclude coverage from those results flowing from the additional hazards created by a prearranged race or speed test; (2) That the legitimate purpose of such an exclusion was to avoid the additional hazards while they existed and not just during that period of time wherein a winner of the race was being determined; and, (3) That whether or not such additional hazards continued to exist beyond the finish line, to such a degree that they reasonably might be called the proximate cause of the casualty, was a question to be resolved by the trier of the facts.

The trial judge, upon waiver of a jury, did so in this case and we do not find the conclusion reached to be erroneous. Rule 73.01(d), V.A.M.R.

*Second*, in connection with the death of the driver, we consider whether or not the insurer has any contractual obligation to pay the $5,000 death benefit under the endorsement. The trial court found that the driver operated the automobile in a prearranged race and competitive speed test, and "reasonably could have foreseen that his conduct was such that as a natural and probable consequence of his acts that he was likely to sustain bodily injury or death and he voluntarily and wantonly exposed himself to unnecessary and known danger by operating said vehicle in the manner aforesaid," and went on to conclude that: ". . . the death [of the driver] did not result directly from injury caused by accident within the meaning of the accidental death coverage of the policy."

The record is consistent with the factual findings of the trial court. Thus, leaving only one question, i. e., is the legal conclusion that the death was not "caused by accident" correct?

Reported cases on the subject seem unlimited. However, the law in this state has been recognized as firmly fixed since Caldwell v. Travelers' Ins. Co., 305 Mo. 619, 267 S.W. 907 (banc 1924). After an exhaustive review of cases from the appel-

late courts of this state as well as other jurisdictions, the court reached several conclusions.

"There are two clearly defined lines of cases on this question. One holds that, where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen.

"The other line of cases holds that, where injury or death is the unusual, unexpected, or unforeseen result of an intentional act, such injury or death is by accidental means, even though there is no proof of mishap, mischance, slip, or anything out of the ordinary in the act or event which caused such injury or death.

\*    \*    \*    \*    \*    \*

"The Missouri decisions, which have discussed the question, have followed the second line of cases that, where the injury is the unexpected result of an intentional act, such injury should be considered as occurring through accidental means." 1. c. 908.

The court, at 1. c. 909, went on to conclude that the second approach, previously followed in this state, was "out of harmony with the best-considered cases elsewhere, and . . . [was] not in accord with sound reasoning." Since that time Missouri has followed the approach outlined in the first line of cases just noted. For instance, as said in Aubuchon v. Metropolitan Life Ins. Co., 142 F.2d 20, 25 [7] (8th Cir. 1944): "In Missouri . . . death *which is merely the unexpected result of a wholly intentional act is not a death from accidental means.* To constitute the means accidental in such a case, some causative mischance, slip or mishap must have occurred in connection with the intentional act." The Caldwell case, supra, was cited as authority for the conclusion noted, and for nearly fifty years the appellate courts

of this state, relative to "indemnity" provisions of insurance policies, have found coverage or no coverage under the rule adopted in Caldwell. Those interested in the reason why the rule applicable to "indemnity" questions can not be applied logically to "liability" questions would be interested in White v. Smith, 440 S.W.2d 497 (Mo.App.1969), wherein the court in a very comprehensive opinion held, 1. c. 507–508: "That instant defendant's acts were *intended* did not exclude the *unintended* result from coverage under the policy in suit. To entertain a contrary view would work an exclusion from coverage of many, if not most, claims for damages arising out of the negligence of insureds and thus defeat the primary purpose for which liability insurance coverage is purchased."

Some of the more recent cases on the immediate question are: Camp v. John Hancock Mut. Life Ins. Co., 165 S.W.2d 277 (Mo.App.1942); Callahan v. Connecticut General Life Ins. Co., 357 Mo. 187, 207 S.W.2d 279 (1947); Murphy v. Western & Southern Life Ins. Co., 262 S.W.2d 340 (Mo.App.1953); Ward v. Penn Mutual Life Insurance Company, 352 S.W.2d 413 (Mo.App.1961); Applebury v. John Hancock Mut. Life Ins. Co., 379 S.W.2d 867 (Mo.App.1964); Sartain v. National Life and Accident Insurance Co., 436 S.W.2d 43 (Mo.App.1968); and, Lindemann v. General American Life Insurance Co., 485 S.W. 2d 477 (Mo.App.1972). In each, it was recognized that "means" and "cause" are used synonymously, and that the same result is reached whether the terminology used in the policy is "accidental means" or "caused by accident."

■ The result in this case must turn on the facts presented to the trial court and the record made. It reflects: (1) That the driver did not intend to cause the result reached; (2) That he did intentionally act in such a manner as to cause the result; (3) That there was no showing of any *causative* mischance, slip or mishap (by way of an intervening factor, with which the driver was not chargeable)

which reasonably could be said to have converted the "intentional act" into one which legally, under the law of this state, could be called an "accidental act." The trial court as trier of the facts so found, and such a finding was not erroneous. Rule 73.01(d).

The judgment is affirmed.

HENLEY, P. J., and DONNELLY, C. J., concur.

FINCH, J., not a member of Division when cause was submitted.