H. Elvin KEARBEY,
Plaintiff-Respondent,

v.

The RELIABLE LIFE INSURANCE COMPANY OF WEBSTER GROVES, MISSOURI, Defendant-Appellant.

No. 9844.

Missouri Court of Appeals,
Springfield District.

July 15, 1975.

G. H. Terando, J. Lee Purcell, Hyde, Purcell, Wilhoit & Edmundson, Poplar Bluff, for defendant-appellant.

Ernie J. Richardson, Poplar Bluff, for plaintiff-respondent.

Before BILLINGS, C. J., and HOGAN and FLANIGAN, JJ.

FLANIGAN, Judge.

This is an action by H. Elvin Kearbey for the "accidental death benefit" contained in an insurance policy issued by defendant-appellant on the life of Thelma Kearbey. Plaintiff is the beneficiary named in the policy. The trial court entered judgment in favor of plaintiff in the amount of $1,500 (the amount of the accidental death benefit) but found in favor of defendant on the issue of additional damages for vexatious refusal to pay.[1]

Defendant appeals from that judgment.

Defendant's answer admitted issuance of the policy but denied that plaintiff was entitled to the accidental death benefit. The answer further alleged "that the actual cause of the death of Thelma Kearbey is undetermined and the plaintiff has furnished no proof that the death of Thelma Kearbey occurred in such a manner as to entitle plaintiff to coverage under the accidental death benefit of the policy."

No oral testimony was introduced. The parties stipulated that four exhibits "shall constitute the evidence to be offered in this cause by plaintiff and defendant." The four exhibits are the death certificate, the autopsy report, the coroner's report, and the insurance policy.

Entries on the death certificate include: Thelma Kearbey died on October 7, 1972, divorced; her death was caused by "the added effect of alcohol and butabarbital in the blood"; the autopsy evidence was considered in determining the cause of death; "Accident, Suicide, Homicide, or Undetermined: Undetermined"; "Date of Injury: October 7, 1972."

The essence of the coroner's report: "I find the cause and place of death to be as follows: Mrs. Thelma Marie Kearbey was D.O.A. at the Doctors Hospital and the results of extensive lab analysis with the autopsy conclude death was due the added effects of alcohol and butabarbital in the body. It is undetermined whether this overdose was accidentally administered or whether it was suicide."

The autopsy report consists of 16 pages and includes a Summary, an "Autopsy Protocol" (which includes detailed findings with respect to the examination, internal and external, of various portions of the

1. Oddly enough, one of appellant's "points relied on" is that the trial court erred in finding for respondent "on the issue of vexatious delay." As indicated, the trial court found in favor of appellant on that issue. Thus the propriety of that finding is not an issue on this appeal.

anatomy), a "Microscopic Description" (which contains microscopic findings with respect to certain portions of the anatomy, including some of those contained in the "Autopsy Protocol"), a Diagnosis, a Comment by the pathologist, and laboratory reports pertaining to blood taken from Thelma Kearbey.

The Summary, after describing Thelma Kearbey as "ex-wife[2] of Elvin Kearbey" (respondent), states: "Thelma Kearbey consumed one-fourth pint of whiskey between 7:30 or 8 p. m., 10–6–72. Mr. Kearbey stated that he fell asleep on the couch and awoke cold so he proceeded to go to bed with his ex-wife Thelma Kearbey. Upon going to bed he stated that she felt cold, so he felt her stomach, and he could not find evidence of breathing. He immediately called the ambulance. Elvin Kearbey stated that this occurred about midnight, and he also stated that approximately two weeks ago the same thing happened and they got her to the Doctors Hospital, but this time, in time to save her life."

The Autopsy Protocol stated there was no evidence of trauma "in the face, scalp, hands, or rest of the skin."

The Diagnosis included: "blood ethyl alcohol 0.281 percent; barbiturate blood 0.9 mg/100 ml of Butabarbital."

The pathologist's Comment contains the following: "No natural disease sufficient to cause death was found. No evidence of mechanical trauma was found. . . . Blood ethyl alcohol was 0.281 percent. In general a stupor or coma will be observed with levels of 0.250 to 0.350 percent. Barbiturate blood level was 0.9 mg/100 ml of Butabarbital. Coma due to Butabarbital in general occurs with levels between 2 and 3 mg per 100 ml. The dose to produce sleep

(hypnotic effect) in general has blood levels between 0.5 to 1.5 mg per 100 ml.

"From these findings it is my conclusion that death was due to the added effects of alcohol and Butabarbital. Alcohol at the level of .281 percent and Butabarbital at the level of 0.9 mg. percent. Most likely a coma developed first and then this was followed by slowing of breathing and later on by stopping of breathing and death."

He stated that the possibilities were suicide, an accidental self-administered overdose, or an accidental or deliberate overdose administered by another person.

The Laboratory Reports contained the following: "Blood contained 0.251 (sic) percent ethyl alcohol by weight as determined by gas chromatography. . . . The analysis of the blood gave the following results: Barbiturate: 0.9 mg/100 ml—Butabarbital."

The "accidental death benefit," on which this action is based, reads: "As a part of the policy proceeds, the Company agrees to pay an accidental death benefit equal to the face amount of the policy, upon receipt of due proof that the death of the insured, (1) resulted directly and independently of all other causes from the[3] accidental bodily injury, which, except in the case of drowning, is evidenced by a visible contusion or wound on the exterior of the body, or is visibly manifest on an autopsy if such injury is internal, and (2) occurred within 90 days from the date of such injury, and (3) occurred prior to the termination of this agreement."

Since the exhibits do not show "a visible contusion or wound on the exterior of the body," plaintiff, to be entitled to the accidental death benefit, has the burden of proof to show:

> beneficiary, valid in its inception, remains so, although the insurable interest, or relationship of the beneficiary, has ceased, unless it is otherwise stipulated in the contract.' "

2. Defendant makes no contention with regard to a lack of insurable interest in plaintiff. In *Bowers v. Missouri Mut. Ass'n,* 333 Mo. 492, 62 S.W.2d 1058, at p. 1064 (1933) it is said: "The divorce subsequent to the issuance of the policy did not destroy its validity . . . .. The general rule is that 'a policy of life insurance, or a designation of

3. The reason for the use of the article "the" instead of "an" is not apparent.

1. The death of Thelma Kearbey directly and independently from all other causes resulted from a bodily injury.

2. The bodily injury, if internal, was visibly manifest on the autopsy.

3. The bodily injury was accidental.

4. The death occurred within 90 days from the date of such injury.

5. The death occurred prior to the termination of the agreement.

Thelma Kearbey's death occurred prior to the termination of the agreement. The death occurred within 90 days "from the date of such injury" if, in fact, the evidence supports affirmative findings with respect to the first three of the listed elements of plaintiff's cause of action. Thus the outcome of this appeal hinges upon whether the evidence shows the existence of the first three elements.

 It is the duty of this court to interpret the insurance policy and to enforce it as it is written and not to remake it. *Brugioni v. Maryland Cas. Co.,* 382 S.W.2d 707, 710[2] (Mo.1964). This court may not create an ambiguity where none is present so as to construe the policy liberally, *Gabel v. Bird,* 422 S.W.2d 341, 343[2] (Mo.1967), and may resort to construction, in the usual sense, of the policy only when its language, in its ordinary meaning, is indefinite, ambiguous or equivocal. *State Dept. of P. H. & W. v. Hanover Ins. Co.,* 431 S.W.2d 141, 143[1] (Mo.1968); 44 C.J.S. Insurance § 290, p. 1139.

 *I.* Did the death of Thelma Kearbey directly result from a bodily injury?

The policy contains no definition of the term "bodily injury," nor indeed of any words or terms.

The term "bodily injury" is defined, in Black's Law Dictionary, Rev. 4th Ed., 1968, as follows: "Any physical or corporeal injury; not necessarily restricted to injury to the trunk or main part of the body as distinguished from the head or limbs; a physical injury only; a cut, bruise, or wound; a localized abnormal condition of the living body; injury caused by external violence."

In 44 Am.Jur.2d Insurance §§ 1223, p. 72, it is said: "The term 'bodily injury' is often used in describing the coverage of accident insurance policies or provisions. It is difficult, however, to lay down an accurate and definite general rule as to what constitutes 'bodily injury' within the meaning of accident policies, or life policies with accident features, and the determination of the question depends upon the facts of the case. . . ."

It should be noted that the policy, in addition to requiring a "bodily injury," requires (except in case of drowning) that the same be "evidenced by a visible contusion or wound on the exterior of the body, or is visibly manifest on an autopsy if such injury is internal." The presence of a "contusion or wound" is required if the injury is an external one but no such requirement exists with respect to an internal injury (the requirement that the latter be "visibly manifest on an autopsy" will be discussed later).

A factually similar case is *Malanga v. Royal Indemnity Co.,* 101 Ariz. 588, 422 P.2d 704 (banc 1967). There the insured Ellis died from an overingestion of barbiturates and alcohol. The policy insured against "loss, resulting directly and independently of all other causes, from accidental bodily injury sustained during the term of the policy. . . ." The insurer argued that the death of Ellis did not result from "accidental bodily injury and that unless there was a cut, bruise or a rupture of some part of the body, there has been no bodily injury within the meaning of the policy."

At p. 707 the court said: "We cannot agree with this contention. If the Company had intended to limit the words 'bodily injury' to injuries which were traumatic in nature, it might easily have done so by simply inserting such a provision in the policy. At best, the fact that such limiting provision is not present makes it uncertain

whether the phrase 'bodily injury' is so limited. When the language of such a policy is unclear this Court has been and continues to be guided by the general rule ' * * * that policies of this nature are construed in favor of the injured when any ambiguity appears therein.' *Dickerson v. Hartford Accident and Indemnity Company,* 56 Ariz. 70, at 76; 105 P.2d 517, 519. Another principle often applied in these cases and applied to this Court in the Dickerson case is that the undefined words of an accident insurance policy will be defined in the common sense terms of the average layman rather than in the terms of a highly technical medical definition.

"Applying the above principles of the Dickerson opinion to the facts of the case presently before us we find that when the central nervous system of Jack Ellis was dulled to the point where automatic breathing and heartbeat were not sufficiently stimulated, so as to sustain life, the deceased incurred a 'bodily injury' within the meaning of the policy. In the sense in which the term 'bodily injury' is ordinarily used and understood, we think it is impossible to conclude otherwise. When a body is so affected that its normal functions are interfered with to the point where death results, the body has been injured."

In *Metropolitan Life Ins. Co. v. Main,* 383 F.2d 952 (5th Cir.) (1967), the synergistic effect of alcohol and barbiturates resulted in damage to the cells and tissues of the body and caused the insured's death. The court held that an injury occurred within the insured's body.

The death certificate of Thelma Kearbey gave her date of death as October 7, 1972. In a separate item on that certificate, the same date is inserted as "date of injury."

This court concludes that the death of Thelma Kearbey directly resulted from a bodily injury. That injury consisted of the physical reaction induced by "the added effect of alcohol and Butabarbital in the blood." The evidence supports the conclusion that the bodily injury was an internal one.

■ *II.* Was the bodily injury "visibly manifest on an autopsy?"

Webster's Third New International Dictionary (1971) contains the following definitions:

Autopsy: Post-mortem examination.

Visible: Capable of being seen; perceptible by vision.

Visibly: In a visible manner.

Manifest: Capable of being readily and instantly perceived by the senses and especially by the sight; not hidden or concealed; open to view.

The presence and respective amounts of alcohol and butabarbital in the blood of Thelma Kearbey were ascertained by laboratory analysis, the particulars of which are set forth in the Laboratory Reports. Those reports are an integral part of the *autopsy* report which, it will be recalled, was an exhibit introduced into evidence by the defendant as well as by the plaintiff. Although it is true that the presence and amounts of the two synergistic agents in the blood of Thelma Kearbey were not detectable by naked eye, without laboratory equipment, the fact is that the utilization of the latter produced unmistakable, definitive and ocularly observable findings and a firm diagnosis of cause of death. This court takes notice of the fact that for many years laboratory analysis has been a common procedure in, and frequently the decisive portion of, an autopsy.

The primary purpose of an autopsy is to ascertain the cause of death. If that quest required the use of modern laboratory tools and data, examined and confirmed by the human eye, as was the situation here, it may properly be said that this internal bodily injury was visibly manifest on autopsy.

Neither the death certificate nor the autopsy report leaves to speculation or conjecture the answer to the basic question "What was the cause of the death of Thelma Kearbey?" That answer is clear; that answer is provided by laboratory analysis; that analysis was an integral part of the autopsy; the human eye, with modern equipment, perused and interpreted the data on which the analysis was predicated.

The question under consideration must receive an affirmative answer.

*III.* Was the bodily injury "accidental?"

Although the instant policy contains an exclusion pertaining to suicide,[4] defendant's answer did not plead that provision as an affirmative defense nor did defendant in the trial court or in this court rely upon same. There is, of course, nothing in this record to support any finding, or even suspicion, that Thelma Kearbey was insane, although suicide while insane is an accidental death. *Brunswick v. Standard Acc. Ins. Co.,* 278 Mo. 154, 213 S.W. 45, 47[3] (banc 1919); *Sommer v. Metropolitan Life Ins.,* 449 S.W.2d 644, 645 (Mo. banc 1970).

With respect to suicide while sane, § 376.-620 RSMo 1969, V.A.M.S.[5] severely restricts, with regard to actions on life insurance policies, the defense of suicide. That statute has been held applicable to policies of accident insurance, *Logan v. Fidelity &*

*Cas. Co.,* 146 Mo. 114, 47 S.W. 948 (1898), although that holding has been criticized.[6]

But the statute plays no role in this case. Referring to the statute, then § 6945, our Supreme Court has said: "The above section has nothing to do with the manner or cause of death. It leaves the parties perfectly free to contract in an accident policy touching the cause of death. If they see fit to contract that there shall be no liability except for a death resulting from an accidental injury, then the proof must shown such a cause of death, before any recovery can be had on the contract. In other words, if the proof, even where aided in a proper case, by the presumption against suicide, yet shows suicide by assured while sane, the plaintiff has simply failed to meet the burden expressly assumed in the insurance contract of proving the death of assured by accident." *Brunswick,* supra at p. 47.

██ It must be kept in mind that the plaintiff, in carrying his burden of proof on the element under consideration, need show only that the bodily injury was accidental. This policy does not contain the term "accidental means" frequently found in double indemnity provisions of life insurance policies[7] or accident insurance policies,[8] as stated in *White v. Smith,* 440 S.W.2d 497, 506 (Mo.App.1969).

The distinction between a policy insuring against *accidental injury* and a policy insur-

4. No accidental death benefit will be payable if death of the insured results directly or indirectly from, or is caused by or contributed to by, . . . (1) suicide or any attempt at suicide, whether sane or insane.

5. Section 376.620 is as follows: "In all suits upon policies of insurance on life hereafter issued by any company doing business in this state, to a citizen of this state, it shall be no defense that the insured committed suicide, unless it shall be shown to the satisfaction of the court or jury trying the cause, that the insured contemplated suicide at the time he made his application for the policy, and any stipulation in the policy to the contrary shall be void."

6. See dissenting opinion of Judge Donnelly, in *Sommer v. Metropolitan Life Ins. Co.,* 449 S.W.2d 644, 648 (Mo. banc 1970).

7. Typically providing benefits for death resulting from "bodily injuries effected directly and independently of all other causes through external, violent, and accidental means." *Callahan v. Conn. Gen. Life Ins. Co.,* 357 Mo. 187, 190, 207 S.W.2d 279, 281 (1947).

8. Likewise typically providing benefits for death "from bodily injuries, effected directly and independently of all other causes, through external, violent and accidental means alone . . ." *Caldwell v. Travelers' Ins. Co.,* 305 Mo. 619, 623, 267 S.W. 907 (banc 1924).

ing against *injury by accidental means* is exemplified by the situation in *Murphy v. Western & Southern Life Ins. Co.*, 262 S.W.2d 340 (Mo.App.1953). There the policy provided for payment on death caused by accidental means. The insured died by reason of an overdose of paraldehyde, which had been prescribed by his physician. The court denied recovery, stating that the insured knew he was taking paraldehyde and the only thing unexpected was the result.

At p. 342 the court said:

"An accident, in common parlance, and as defined in Webster's New International Dictionary, Second Edition, is:

'1. a. An event that takes place without one's foresight or expectation; and undesigned, sudden, and unexpected event. b. Hence, often, an undesigned and unforeseen occurrence of an afflictive or unfortunate character; a mishap resulting in injury to a person or damage to a thing; a casualty; as, to die by an accident.'

"Under the above definition, which merely *requires* the element of unexpectedness, a *result* may be *accidental* (although it proceeded from an intentional act) under the terms of a policy insuring against *accidental death,* if one can say that the result was an unusual or unexpected consequence of such intentional conduct. However, when we consider a policy which requires as a prerequisite to liability that the injury or death must be caused by *'accidental means'*, a new element of unexpectedness is introduced. In such a case we no longer look to the *result*, viz., the injury or death, in determining whether the loss is covered, but must look to the *means*. *Caldwell v. Travelers Insurance Co.*, 305 Mo. 619, 267 S.W. 907, 39 A.L.R. 56. The policy in such a case provides a restricted form of insurance, rather than straight accident insurance, and requires that there be an element of unexpectedness in the means which produces the result." (Emphasis added.)

In 45 C.J.S. Insurance § 753b, p. 778, it is said: "If death or injury is the unexpected or unintentional result of some act, although voluntarily done by deceased or the person injured, it is an accidental death or injury."

In *Applebury v. John Hancock Mutual Life Insurance Co.*, 379 S.W.2d 867, 870 (Mo.App.1964) the court quoted with approval the following language from 45 C.J.S. Insurance § 753b, pages 779, 780: "If the death or injury, although unforeseen or unexpected, results directly from insured's voluntary act, unaccompanied by anything unexpected, unusual, or unforeseen, it is not death or injury by accidental means, *although the result may be such as to constitute an accidental injury.*" (Emphasis added.) And in *Camp v. John Hancock Mut. Life Ins. Co.,* 165 S.W.2d 277, 280 (Mo.App. 1942) it is said: "So it is that even though, as not infrequently happens, an unusual or unexpected result may occur by reason of the doing by the insured of an intentional act, nevertheless, if there has been no mischance, slip, or mishap in the doing of the act itself, the resulting death, *though itself accidental* in the sense of being unintended and unexpected, is not caused through accidental means as that term is employed in the policy." (Emphasis added.)

The defendant in its brief makes the following assertion "In order to have proven that the manner in which the insured died was an accident, the respondent was obligated to show that the act by the insured which preceded the injury was something unforeseen, unexpected, unusual in its occurrence, and did in fact produce the injury." In support of that assertion defendant cites *Caldwell v. Travelers Ins. Co.,* 305 Mo. 619, 267 S.W. 907 (banc 1924).

As our Supreme Court stated, in *Farmers Insurance Exchange v. Peters,* 502 S.W.2d 319, 323 (Mo.1973), since the decision in Caldwell, Missouri has followed a line of cases which hold that "where an unusual or unexpected result occurs by reason of the doing by insured of an intentional act, where no mischance, slip, or mishap occurs

in doing the act itself, the ensuing injury or death is not caused through accidental means; that it must appear that the means used was accidental, and it is not enough that the result may be unusual, unexpected, or unforeseen."

There is no evidence in this case to show that when Thelma Kearbey was ingesting the alcohol and the drugs, a "mischance, slip, or mishap" occurred during that process. Thus, if the instant policy conditioned coverage upon death "by accidental means," plaintiff's case would fail.

But the policy is not couched in terms of "accidental means." [9] Plaintiff makes a case, the other elements of her cause of action having been established, if the *injury*, as distinguished from the means by which the injury was accomplished, was accidental. The distinction is that between cause and effect. Although Thelma Kearbey may have intentionally consumed the fatal combination, the injury, that is the effect, was accidental if it was not intended.

In *Farmers Insurance Exchange v. Peters*, supra, recovery upon an automobile accidental death indemnity was denied because, although the driver did not intend to cause his death, he did intentionally act in such a manner as to cause the result and there was no showing of any causative mischance, slip, or mishap "which reasonably could be said to have converted the 'intentional act' into one which legally under the law of this state, could be called an 'accidental act.'" But in that case the policy afforded coverage "if death resulted directly from bodily injuries 'caused by accident.'"

In the case at bar, though there was no showing of accidental means, or accidental causes, there was a showing of accidental

result if the plaintiff is entitled to the benefit of the presumption against suicide.

There are several reasons underlying the presumption against suicide. They include the facts that love of life is the strongest instinct of human beings, that the ordinary person has a fear of death and a fear of the pain which might be suffered in the act of self-extermination, and that some religions teach that sanctions are imposed upon those who end their own lives. Self-destruction is contrary to the general conduct of mankind. *Perringer v. Metropolitan Life Ins. Co.*, 241 Mo.App. 521, 244 S.W.2d 607, 614 (1951).

But the presumption against suicide does not carry with it the further presumption that death was accidental. *Laessig v. Travelers' Protective Association*, 169 Mo. 272, 279, 69 S.W. 469 (1902); *Perringer v. Metropolitan Life Ins. Co.*, supra, 244 S.W.2d 607, 614.

When a plaintiff "has put in evidence circumstances which prove that the death was either accidental or suicidal, the unreasonableness of the theory of suicide must receive due consideration in weighing it against the more reasonable and natural theory of accident." *Reynolds v. Maryland Cas. Co.*, 274 Mo. 83, 201 S.W. 1128, 1132[4] (banc 1918).

"The presumption against suicide is a rule of law deduced from convenience and necessity . . . it arises in a case whenever the cause of death is in issue and the evidence discloses a state of facts consistent with either accident or suicide. . . . It is to be invoked, or automatically rises, to be exact, when there is no convincing evidence for or against suicide, and in such case, perforce this presumption alone, a finding in favor of accidental death will be upheld . . . If the evidence in

9. Although not cited in the briefs, candor compels the concession that in *Commercial Ins. Co. of Newark, N. J. v. Orr*, 379 F.2d 865 (1967) (8th Cir.), a case based on Missouri law, an insuring clause which provided

for payment of loss, including death, "resulting directly and independently of all other causes from accidental bodily injury" was construed to require the proof of "accidental means." But recovery was allowed.

favor of suicide is wholly circumstantial, then it ought to be such and of such weight as to negative every reasonable inference of death by accident . . . Obviously the presumption against suicide cannot continue to exist in the face of evidence showing suicide." *Brunswick v. Standard Accident Ins. Co.*, 278 Mo. 154, 213 S.W. 45, 50[9] (banc 1919). See also *Gilpin v. Aetna Life Ins. Co.*, 234 Mo.App. 566, 132 S.W.2d 686, 692[2–6] (1939).

A review of the evidence justifies the following conclusions: The death of Thelma Kearbey was caused by the synergistic effects of alcohol and butabarbital. Early in the evening she had voluntarily consumed some whiskey. Her death occurred at approximately 12:45 a.m. on October 7, 1972. There was no evidence that the butabarbital was caused to be introduced into her body by the act, negligent or intentional, of another person. There is certainly no basis for inferring that plaintiff was in any way responsible for his former wife's ingestion of the alcohol and drug. No suicide note or other evidence of an intent toward self-destruction is shown. If, and it is a reasonable inference, Thelma Kearbey voluntarily [10] consumed the alcohol and drug which combined to cause her death, there is no showing that she intended such a result. Nor is there any evidence that she intended to take an overdose of either or both of the fatal agents.

Although the Autopsy Report quotes the plaintiff "that approximately two weeks ago the same thing happened and they got her to the Doctors Hospital, but this time in time to save her life," that episode, standing alone, does not support the inference that Thelma Kearbey intended to take her own life. Even if it be assumed that the prior occurrence involved consumption of alcohol and drug, it does not follow that Thelma Kearbey had suicidal intentions. Indeed, the high level of alcohol in her blood on the fatal occasion might indicate that the consumption of the drug was the unthinking act of an intoxicated person. There is no showing that Thelma Kearbey was cognizant of the deadly combination of the things which she ingested.

The entry on the death certificate to the effect "Accident, Suicide, Homicide or Undetermined: Undetermined." is not controlling. "Whether the death was accidental, suicidal or homicidal would not be within the personal knowledge of the physician and his statement with respect thereto would be merely his opinion, his 'probable' conclusion, and not a statement of fact." *Callahan v. Conn. Gen. Life Ins. Co.*, 357 Mo. 187, 207 S.W.2d 279, 286[5] (1947).

In short, as stated in *Brunswick v. Standard Accident Ins. Co.*, supra, 213 S.W. 45, 50, "There is no convincing evidence for or against suicide and in such case the presumption of suicide will uphold a finding in favor of accidental death." In *Hendrix v. Metropolitan Life Ins. Co.*, 250 S.W.2d 518, 520[1] (Mo.1952) it is said: "The presumption against suicide is so strong that unless the evidence negatives every reasonable inference of death by accident, a finding of death by accident will be justified.

The parties have stipulated that "the only question involved" is whether the policy afforded the accidental benefit "under the facts and circumstances in this case." There is no claim by defendant that the exhibits were not furnished to defendant prior to the filing of this action.

This court concludes that the evidence, aided by the presumption against suicide, supports the finding that the bodily injury was "accidental."

The judgment is affirmed.

All concur.

---

10. Of course, if Thelma Kearbey accidentally consumed them, the outcome is the same.